Richard C. WILKINSON

v.

The STATE CRIME LABORATORY
COMMISSION et al.

No. 2000–410–Appeal.

Supreme Court of Rhode Island.

Jan. 31, 2002.

Sean M. McAteer, for Plaintiff.

Louis J. Saccoccio/James R. Lee, Providence, for Defendant.

Present LEDERBERG, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

This is a government-employment dispute involving a whole passel of claims and counterclaims between a classified "full status" state employee and the state governmental entities and individuals that either employed him or supervised his work at the state's crime laboratory. Both sides have appealed from the Superior Court judgments that disposed of the parties' respective claims.

To resolve the legal issues presented, we must construe provisions of the Merit System Act (merit system)—specifically G.L. 1956 § 36–4–59 (tenure in state service) and § 36–4–38 (dismissal)—as well as the State Crime Laboratory Commission Act (crime lab act), G.L.1956 § 12–1.2–6. In addition, we must decide whether certain 1994 amendments to the crime lab act (the 1994 amendments) stripped the plaintiff, Richard C. Wilkinson (plaintiff or Wilkinson), of a property interest in his "full status" as a classified employee under the merit system. Finally, we also must consider whether the individual defendants— Louis Luzzi (Luzzi), who was dean of the Pharmacy Department of the defendant University of Rhode Island (URI) and also served as executive secretary to the Commission, and Dennis Hilliard (Hilliard), who was the director of the crime laboratory, defamed Wilkinson and whether Hilliard committed contempt of court.[1] With respect to defendants' counterclaims, we address whether, as part of his employment at the crime laboratory, Wilkinson was entitled to receive certain benefits and compensation from either or both defendants, URI, and the defendant State of Rhode Island (state). For the reasons classified below, we reverse in part the

---

1. Wilkinson raises numerous arguments on appeal that he has failed to brief properly for this Court's review. Although he lists twelve different specifications of error on appeal, the majority of them are not discussed in the body of his brief. Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue. See O'Rourke v. Industrial National Bank of R.I., 478 A.2d 195, 198 n. 4 (R.I.1984) (citing Mercurio v. Fascitelli, 116 R.I. 237, 354 A.2d 736 (1976), and holding that the plaintiff's failure to present legal authorities and to argue an asserted error of the trial court in their legal brief constituted a waiver of that alleged error). See also Article I, Rule 16 of the Supreme Court Rules of Appellate Procedure, "Briefs." Accordingly, of Wilkinson's twelve issues raised on appeal, we deem the following to be waived by reason of improper briefing: (1) whether Wilkinson's 1992 termination violated his federal and state due-process rights; (2) whether defendants violated Wilkinson's

due-process rights when they failed to reinstate him in 1994 to the position of acting director of the crime lab and denied him longevity benefits; (3) whether defendants refused in bad faith to accede to Wilkinson's demand of employment and money, thereby violating his due-process rights; (4) whether defendants terminated Wilkinson in violation of state law in retaliation for his insistence that the crime lab should be managed in accordance with state law; (5) whether the "leadership of URI" and Hilliard tortiously interfered with Wilkinson's employment relationship with the Commission; (6) whether defendants retaliated against Wilkinson for his reporting to the proper authorities about the crime lab's management, in violation of G.L.1956 chapter 50 of title 28; (7) whether defendants' alleged violations of chapter 50 of title 28 and the "other cited statutes and provisions" damaged Wilkinson. Because we hold that the 1994 amendments did not reclassify Wilkinson into a "limited term" appointee, we do not reach his alternative arguments concerning reclassification.

rulings on summary judgment, affirm the final judgment embodying the trial justice's rulings, and remand this case to the Superior Court for further proceedings consistent with this opinion. The pertinent facts and travel of this case are as follows.

### Facts and Travel

In 1971, Wilkinson began working as a criminalist for the state in what was then known as the Laboratories for Scientific Criminal Investigation (laboratory), located at URI's Kingston campus. In June 1973, he became the laboratory's assistant director. In 1978, however, the General Assembly enacted G.L.1956 chapter 1.2 of title 12, via P.L.1978, ch. 206, § 2, which established the State Crime Laboratory Commission (commission), a named defendant herein. It also enacted G.L.1956 chapter 1.1 of title 12, via P.L.1978, ch. 205, art. VIII, § 1, which established the State Central Crime Laboratory (lab or crime lab) at URI.[2] Section 12–1.1–8 authorized the commission, among other

things, to pay the salaries of lab employees and to monitor the crime lab's general operation. Although the General Assembly did not authorize URI in 1978 to supervise the commission's employees or to manage the lab's activities, nevertheless, URI did so by exercising a close oversight of the lab and its personnel.[3]

In July 1988, after obtaining twenty years of state-service credit, plaintiff achieved "full status" under the state's merit system as a classified commission employee for which he received his twenty-year certificate.[4] In 1990, as part of a salary negotiation, the state offered plaintiff the nonclassified position of associate professor of toxicology at URI, in addition to his preexisting position as assistant director of the crime lab. The state also allowed plaintiff to work fewer hours, for the same salary. Wilkinson accepted the offer, and in March 1991, the state appointed him acting director of the crime lab.

The present dispute arose with respect to a disagreement over what entity or

---

2. The 1981 reenactment of G.L.1956 chapters 1.1 and 1.2 of title 12 reorganized the 1978 enactment. All references herein to the 1978 enactments are to their original chapter and section numbers in the General Laws.

3. The 1978 enactment of G.L.1956 § 12–1.2–3 provided that "[t]he dean of the college of pharmacy at the university of Rhode Island [where the crime lab is located] shall serve as the executive secretary of the commission." Section 12–1.2–12 also provided that "[t]he commission is hereby directed * * * to confer with the University of Rhode Island as to the continued utilization of facilities, scientific equipment and personnel available." Although the crime lab act did not authorize URI to manage the lab and its employees, the location of the lab on URI's campus, plus over twenty years of URI's de facto involvement in running the lab, resulted in both URI and the commission exercising some form of joint oversight of the lab.

4. The record does not reveal exactly how Wilkinson obtained twenty years of service credit

in 1988 after he began working for the state in 1971. Wilkinson's complaint alleged that he had achieved full status as a classified state employee under G.L.1956 § 36–4–59 (providing tenure to state employees who have achieved twenty years of service credit). In his brief, and at oral argument, however, Wilkinson suggested that he had achieved full status under both § 36–4–59 *and* G.L.1956 § 36–5–7, entitled "State employees-Veterans" (providing tenure after fifteen years of state service to state employees who are honorably discharged veterans of the United States armed forces). As noted below, the statutes are identical concerning the full-status benefits that they confer on such employees, differing only in the number of years of service credit needed to achieve full status. *See* note 13, *infra.* Both of these statutes are subject to a "sunset" provision making them inapplicable "to those employees whose base entry date is after August 7, 1996." *See* § 36–4–59(b) and § 36–5–7(b).

entities actually employed Wilkinson and to whom he was required to report. By letter dated January 8, 1992, Luzzi notified Wilkinson in writing that he was being fired for his alleged insubordination to Luzzi and to URI. On or about February 24, 1992, the commission ratified the action taken by Luzzi and terminated Wilkinson from state employment. On June 30, 1992, however, the commission decided that it should provide Wilkinson with a post-termination hearing. The commission held that hearing on July 22 and 23, 1993, after which it referred the matter to the Attorney General's office (AG) for findings of fact and conclusions of law (a designee of the AG chaired the commission). The AG determined that Wilkinson and all other employees of the crime lab were not URI employees; rather, such employees were statutorily responsible to the commission alone. Thus, the AG concluded, Luzzi lacked authority to act as Wilkinson's superior. The AG also concluded that Wilkinson could not have been insubordinate to Luzzi because Wilkinson was responsible only to the commission (rather than to Luzzi and URI), and that his termination for alleged insubordination had been improper.

After his termination, Wilkinson filed a claim for unemployment compensation benefits. Initially, the director of the Department of Employment Security (DES) denied Wilkinson's claim, stating that he had been discharged for "proved misconduct," and was thereby barred from receiving unemployment benefits by G.L. 1956 § 28–44–18. The defendants URI and the commission were parties to the administrative proceedings and to the administrative appeal to the District Court under G.L.1956 § 42–35–15 of the Administrative Procedures Act that followed the agency's denial of benefits to Wilkinson.

The District Court referred the matter to a master, who ultimately issued written findings of fact and law. Thereafter, the District Court duly adopted the master's findings and recommendations as the decision of the court and entered judgment thereon in favor of Wilkinson. The District Court ruled that:

"[I]t is clear that the University's view of its authority over the Crime Laboratory was contrary to law. No rational person may suggest that state employees by their administrative action may overrule duly promulgated laws. From the record before the [DES] Board it cannot be determined when in recent history this illegal encroachment first occurred. It matters not. It is also irrelevant whether the administrative authority asserted by [URI] was the result of a simple misunderstanding, mere presumptuousness, an abdication of responsibility by others, or an intentional usurpation. * * * Therefore at all times relevant [Wilkinson] was answerable only to the [c]ommission."

In effect, the District Court's decision declared that from 1978 to the time of the court's decision, Wilkinson had been a classified employee of the commission—and not of URI. Because defendants did not seek this Court's review of that ruling, the District Court's judgment became final and binding on defendants.

Later, in 1994, the commission requested an advisory opinion from the Attorney General (AG) to determine whether Wilkinson's acceptance in 1990 of the position of associate professor at URI had altered his full status under the merit system as a classified state employee. The AG opined that Wilkinson's acceptance of the URI associate professorship position had no effect on his classified full-status employment with the state. As a commission employee, Wilkinson, the AG concluded,

could be fired only for cause; that he had never been informed that accepting the associate professorship position at URI would affect his rights under the merit system; and that, in any event, state employees like Wilkinson could not validly waive rights that they were unaware they were surrendering. As a result, the AG recommended that the commission reinstate Wilkinson to his commission job with back pay.

Pursuant to the AG's recommendation, the commission reinstated Wilkinson to his job at the lab. But the commission reinstated Wilkinson as a criminalist, a lower-ranking position than his former job as assistant lab director. In response to this unsatisfactory reinstatement, and to resolve other disputes over the restoration of his employment benefits, Wilkinson instituted this Superior Court lawsuit in 1994— well before his final discharge occurred, in 1996.[5]

Thereafter, in 1994, the General Assembly amended the crime lab act to convert all commission jobs at the lab into "limited appointment positions of the board of governors for higher education and [they] shall be subject to all employment policies, practices, and procedures of the board of governors for higher education and the University of Rhode Island." Section 12–1.2–6, as amended by P.L.1994, ch. 50, § 2. Then, in 1996, apparently at the urging of Luzzi and Hilliard, the commission terminated Wilkinson from his employment with the state by refusing to reappoint him to his criminalist job at the lab, asserting that

his limited-term position there had expired. The commission's refusal to reappoint Wilkinson occurred without any assertion of cause to discharge him from state employment.

Wilkinson then amended his complaint to challenge his termination. In due course, the case proceeded to summary judgment in the Superior Court, after Wilkinson and defendants had filed cross-motions seeking this relief. Wilkinson contended that, as a matter of law, he was a classified full-status employee who could not be terminated from state employment without just cause. The defendants argued, however, that, because of the 1994 amendments, Wilkinson had become a statutorily appointed limited-term employee of URI. Consequently, they urged that he had lost the benefits previously afforded to him when he was a classified, full-status employee of the commission under the merit system.[6]

In response, Wilkinson argued points too numerous to be recited here,[7] but the motion justice ruled that the 1994 amendments constituted a later-enacted and more specific statute that took precedence over the earlier-enacted, general provisions of the merit system. Consequently, the motion justice dismissed most of Wilkinson's claims, including one for wrongful discharge, because the court determined that he was, as a matter of law, a limited-term appointee subject to termination without cause at the end of his term. The motion justice, however, allowed Wilkin-

---

5. Thus, this action already was pending in 1996 when the commission refused to reappoint Wilkinson to his job at the lab—or to any other job in state government. Also, in 1996, before the commission decided not to reappoint or retain Wilkinson in his lab job, a Superior Court justice had issued a restraining order against lab-director Hilliard, preventing him from taking any adverse action

against Wilkinson in retaliation for his refusal to clean a contaminated safe at the lab. Nevertheless, the next day Hilliard informed the commission about Wilkinson's refusal to clean the safe.

6. See note 9, infra.

7. See note 1, supra.

son's contempt claims against Hilliard and defendants' counterclaims against Wilkinson to proceed to a nonjury trial on an agreed statements of facts.

At the conclusion of the nonjury trial, the trial justice found that Wilkinson had failed to prove his contempt case against Hilliard because he could not show that Hilliard was aware of the restraining order when he had informed the commission about Wilkinson's allegedly insubordinate refusal to clean up a contaminated safe at the lab. Furthermore, the trial justice ruled that defendants' counterclaims against Wilkinson—seeking reimbursement of the employment benefits he had received when he worked at the lab—were baseless because whatever benefits Wilkinson had received when he worked there, he received them in connection with his crime-lab employment and not because he was considered a URI employee. In essence, the trial justice ruled that the benefits Wilkinson had received while working at the lab were legitimate consideration for his work there, regardless of what governmental entity or entities actually employed him during the years in question.

On appeal, Wilkinson argues that the 1994 amendments did not—and, indeed, could not—have any effect on his classified full-status employment with the state. Even though the amendments subjected him to the oversight and employment practices of URI, he contends, they did not and could not have divested him of his tenure as a classified full-status state employee, one who could not be dismissed or terminated from state employment without just cause. He therefore requests that this Court order his reinstatement to state-government employment and award him damages and benefits commensurate with his claims. The defendants' respond that, as a result of the 1994 amendments, Wilkinson lost his classified full-status employment and became a nonclassified, limited-term URI employee who could be terminated or not reappointed with or without cause.

The defendants' counterclaims also questioned Wilkinson's employment status at the crime lab. They contended that, because Wilkinson was a commission employee from 1978–1994 when he worked at the lab, but not a URI employee, he was not entitled to the salary he received, to the tuition waivers he obtained for his children, or to a shortened work week—all of which, they contend, were available only to URI employees. Wilkinson argues that the trial justice correctly decided that he was in fact entitled to these benefits as a result of his commission employment at the crime lab, even though URI was not his statutory employer during this period.

## Analysis

### I. Claims Disposed of by Summary Judgment

### A. Did Wilkinson's classified full-status employment under the merit system vest him with a protected property right entitling him to due process and to just-compensation protections?

In granting summary judgment in favor of defendants, the motion justice ruled that Wilkinson had achieved full status in his classified position at the crime lab in 1988, but that "the plaintiff's classified status terminated when the legislature [in the 1994 amendments] made all positions of the lab limited appointment positions subject to the approval of the Commission." The motion justice further ruled that, after the 1994 amendments, "as a matter of law, plaintiff had no constitutionally protected interest [as a limited-appointment, crime-lab employee] * * * to which due-process

protections attached."[8] She based this conclusion on her belief that the 1994 amendments had stripped Wilkinson of his classified full-status employment at the crime lab because the 1994 crime-lab amendments were a specific-effect statute that superseded the general, earlier-enacted provisions of the merit system. *See Casey v. Sundlun*, 615 A.2d 481, 483 (R.I. 1992) (holding that G.L.1956 § 43–3–26 embodies a policy of statutory construction that requires courts to give precedence to a specific statute over a general statute when the two are in conflict).

This Court "reviews the granting of a summary judgment motion on a *de novo* basis." *M & B Realty, Inc. v. Duval*, 767 A.2d 60, 63 (R.I.2001) (citing *Marr Scaffolding Co. v. Fairground Forms, Inc.*, 682 A.2d 455, 457 (R.I.1996)). "In conducting such a review, we are bound by the same rules and standards as those employed by the trial justice." *Id. See Rotelli v. Catanzaro*, 686 A.2d 91, 93 (R.I.1996). "[A] party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions." *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1225 (R.I. 1996). "Rather, by affidavits or otherwise [the opposing party has] an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact." *Providence Journal Co. v. Convention Center Authority*, 774 A.2d 40, 46 (R.I.2001) (quoting *Bourg v. Bristol Boat Co.*, 705 A.2d 969, 971 (R.I.1998)).

We will affirm the granting of a summary judgment if, after reviewing the evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact existed and that the moving party was entitled to judgment as a matter of law. *Woodland Manor III Associates v. Keeney*, 713 A.2d 806, 810 (R.I.1998). For the reasons stated below, we hold that, as a matter of law, the motion justice erred when she granted summary judgment in favor of defendants; on the contrary, Wilkinson was entitled to a grant of summary judgment on his constitutional claims because, as a matter of law, the 1994 amendments did not divest him of his classified full-status employment with the state.

Under § 36–4–2 the classified service "shall comprise all positions in the state service now existing or hereinafter established, except the following specific positions * * * or hereinafter specifically exempted * * *." Because neither commission employees nor lab employees were listed in § 36–4–2 when Wilkinson was appointed to his crime-lab job, employees holding these positions served within the state's classified service. Moreover, § 36–4–38 provides in relevant part that "[a] classified employee with permanent status may be dismissed by an appointing authority whenever he or she considers the good of the service to be served thereby, stated in writing,

---

**8.** It should be noted that defendants' legal position is that "[a]s a limited term appointee [Wilkinson] has no due process or other right to re-appointment * * *" and that "[n]o cause is required to disapprove an appointment." Thus, defendants have argued on appeal that Wilkinson's appropriate remedy was an appeal to the Personnel Appeal Board (PAB). But if the 1994 amendments truly had converted Wilkinson to a limited-term, non-

classified employee, as defendants contend, then the PAB would have lacked jurisdiction to hear his appeal. *See Rhode Island Board of Governors for Higher Education v. Newman*, 688 A.2d 1300, 1303 (R.I.1997) (holding that "the [PAB] has no jurisdiction over non-classified employees who are subject to the exclusive control of the commissioner of higher education * * * ").

with full and sufficient reason, and filed with the personnel administrator. * * * In every case of dismissal, the appointing authority shall, *on or before the effective date thereof give written notice of this action and the reason thereof to the employee* and shall file a copy of the notice with the personnel administrator * * *." (Emphasis added.) *See Aniello v. Marcello,* 91 R.I. 198, 206, 207, 162 A.2d 270, 274 (1960) (holding that an appointing authority cannot summarily dismiss a classified employee, and that the language " *'the good of the service to be served thereby'* " in § 36–4–38 has the " 'effect of limiting the valid exercise of that power to dismiss for cause' ") (modified by subsequent statutory amendments). Nonclassified employees of URI, however, are under the exclusive control of the commissioner of higher education. *See Rhode Island Board of Governors for Higher Education v. Newman,* 688 A.2d 1300, 1303 (R.I.1997).

The merit system also provides that "[e]very person who shall have twenty (20) years, not necessarily consecutive, of service credit, the credits having been earned in either the classified, nonclassified, or unclassified service of the state or a combination of both, shall be deemed to have acquired full status in the position he or she holds at the time of obtaining twenty (20) years of service credit." Section 36–4–59(a)(1). Nevertheless, "this section shall not apply to employees of the state government whose method of appointment and salary and term of office is specified by statute." Section 36–4–59(a)(2)(iii). The defendants argue that, whatever Wil-

kinson's status was before 1994, the 1994 amendments altered his status because they provided that his method of appointment was henceforth to be one specified by statute, thereby removing him from the rolls of the merit system.

It is undisputed, however, that as of 1988 Wilkinson had accumulated twenty years of service credit and that, when he was hired in 1971 and working at the crime lab in 1988, his position there was not statutorily specified. Thus, in 1988 he achieved full status under the merit system in his classified position as a commission employee working at the crime lab. Although the 1994 amendments specified that, effective on the date of passage, employees of the crime lab would be limited-term appointees subject to URI employment rules and practices, the amendments did not alter Wilkinson's preexisting protected status by rendering his previous crime-lab appointment one that was statutorily specified.[9]

■ We first consider whether, as of 1994, Wilkinson possessed a legitimate claim of entitlement to continued employment under the merit system. A "state employee who, under state law or rules promulgated by state officials, has a legitimate claim of entitlement to continued employment absent sufficient cause for discharge, may demand the procedural protection of due process." *Lynch v. Gontarz,* 120 R.I. 149, 157, 386 A.2d 184, 188 (1978); *see also Barber v. Exeter–West Greenwich School Committee,* 418 A.2d 13, 19–20 (R.I.1980) (holding that a tenured teacher who can be dismissed only for

---

**9.** The 1978 version of G.L.1956 § 12–1.2–6 (12–1.2–9) provided that the commission would have final appointive authority over all crime lab positions, thereby rendering them "classified" positions. The 1994 amendments to § 12–1.2–6 provided that, effective on the date of its passage, all positions in the crime

lab "shall be considered limited appointment positions" and that URI would have the authority to make such appointments, thereby converting lab employees into nonclassified appointments and removing them from the Personnel Appeals Board jurisdiction. *See Newman,* 688 A.2d at 1303.

good cause has a legitimate claim of entitlement to his or her position, and may not be deprived of it without due process of law). The United States Supreme Court has had several opportunities to discuss what constitutes a property right that will entitle its holder to the due-process protections of the Fourteenth Amendment to the United States Constitution. Frequently, these issues have arisen in the context of educational institutions that grant tenure to teachers or professors.[10] In *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court defined what constituted a protected property interest in an employment benefit. Specifically, the high Court stated that:

> "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined * * * [and that property interests] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 561.[11]

Applying these standards to the statutes before us, we note that the state's merit system contains a two-tiered system of state employment. The first tier is the classification of state employment positions. The second tier is the tenure in state employment that an employee achieves after a specified number of years in state service. *But see* footnote 4, *supra.* We turn first to the classified service.

■ In applying these constitutional principles to the classified service, it is evident that achieving permanent classified status under the merit system grants to the state employee in question a legitimate claim of entitlement to continued employment with the state. As a result, an employee who has achieved permanent classified status in his or her employment with the state has a property right in continued government employment and is entitled to due-process protections before he or she can be deprived of that property right. On the other hand, a classified employee is not totally insulated from termination. For example, if the state determines that cause exists to terminate the employee or that it is necessary to lay off, reorganize, or otherwise abolish a classified employee's position, it is entirely possible, and even probable, that such a decision would be upheld "for the good of the service"— unless the decision was arbitrary, pretextual, or irrational. But a rational, non-pretextual, and non-arbitrary employment decision would provide cause for termination—provided, of course, that procedural due-process rights were duly afforded to the terminated employee.

We next examine the effect of achieving full status under § 36–4–59. Once an employee, in any category of state service, has accumulated twenty years of service

---

**10.** It should be noted that § 36–4–59 is titled "Tenure in state service."

**11.** *See also Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (holding that property is not limited to technical forms, but encompasses a broader definition). "A person's interest in a benefit is a 'property' interest * * * if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit * * *." *Id.* at 601, 92 S.Ct. at 2699, 33 L.Ed.2d at 580.

credit, he or she is provided with even greater protections than those afforded to mere classified employees. A classified full-status employee still may not be fired except for cause. The definition of what constitutes cause, however, is altered by the statute after the employee achieves "full status" protection. For example, a full-status employee may not be separated from state service because of layoffs or reorganizations. The full-status employee whose position is lost through layoffs or reorganization still "shall be retained within the state services in a position of similar grade." Section 36–4–59(a)(2)(ii). Moreover, and more importantly for the case at bar, an employee who achieves full status (classified or otherwise) acquires full status in "the position he or she holds at the time of obtaining twenty (20) years of service credit." Section 36–4–59(a)(1).

Although this Court has not had the opportunity to comment directly on whether a government employee's achievement of classified or full status under the merit system creates a property right subject to constitutional protections, we have suggested as much in the past. In the case of *Blanchette v. Stone*, 591 A.2d 785, 787 (R.I.1991), the Court was called upon to construe § 36–5–7, another provision of the merit system. The plaintiff in *Blanchette* was a Rhode Island State Police officer, who involuntarily was "retired" from the state police force. In challenging his "retirement," Blanchette argued that he had achieved full-status protection under the merit system, and therefore could be "retired" only for cause. The Court

ultimately held that the Legislature never intended the merit system's full-status protections to apply to state police officers.[12] In so holding, however, the Court stated that "§ 36–5–7 was never intended to apply to members of the Rhode Island State Police, and without the protections afforded under § 36–5–7, Blanchette acquired no *property interest* in continued employment that would assure him of due-process protections." *Blanchette*, 591 A.2d at 787. (Emphasis added.) Thus, in *Blanchette*, we alluded by negative inference to the fact that a state employee would, in fact, obtain a property interest in continued state employment by achieving full status under the merit system.

In addition, the United States Supreme Court's definition of a property right indicates that a state statute can confer a property interest on government employees, thereby entitling those employees to the due-process and just-compensation protections that are found in both the state and federal constitutions. And unlike the seniority rights and other statutory veterans' benefits that were at issue in *Brennan v. Kirby*, 529 A.2d 633, 641 (R.I. 1987), Wilkinson actually had received the classified full-status benefits conferred on him by the state when the legislation in question was enacted. Thus, as of 1988, when Wilkinson completed his twenty years of state service credit and received his full-status certificate, this statutory benefit had matured from a mere gratuity or floating expectancy into a full-blown vested property right.[13] We therefore ex-

---

12. As unclassified employees, the state police "serve[ ] at the pleasure of [their] appointing authority." *Blanchette v. Stone*, 591 A.2d 785, 787 (R.I.1991). Therefore, they do not receive the benefits of classified employees.

13. The distinction between a claimant's potential eligibility for a statutory benefit and actually qualifying to receive it for purposes

of establishing a vested property interest or contractual right in the benefit was also dispositive in *D. Corso Excavating, Inc. v. Poulin*, 747 A.2d 994 (R.I.2000) (holding that the claims to a statutory benefit had not yet vested when the Legislature eliminated the benefit) and *Retired Adjunct Professors v. Almond*, 690 A.2d 1342 (R.I.1997) (noting that the

plicitly hold that achieving full status under the merit system provides state-government employees with a property right in the position and classification that they hold at the time they achieve full status, entitling such employees to due-process and just-compensation protections against any attempted elimination or alteration of their property rights.

Since 1988 Wilkinson has possessed a property interest in his classified full-status employment with the state. Thus, he could not have been deprived of that interest without due process of law. Nor can the state take that interest away from him without cause to do so, or, lacking such cause, without paying him just compensation.[14] Consequently, the hearing justice was incorrect when she held that Wilkinson possessed no "protected interest" in his full-status employment with the state when the Legislature enacted the 1994 amendments.

### B. What effect, if any, did the 1994 amendments have on Wilkinson's classified full-status employment?

The defendants argue that the 1994 amendments stripped Wilkinson of his classified full-status employment and that the General Assembly possessed the inherent authority to alter its prior policy by enacting such amendments. Moreover, defendants argue, the specific provisions of the 1994 amendments take precedence over the general provisions of the merit system. It is true that when statutes conflict, a later-enacted specific statute will be given effect over the earlier-passed general statute. *See* § 43–3–26 (requiring the harmonization of statutes, but if that is not possible, then the specific statute trumps the general statute).

 This Court, however, long has held that "statutes *and their amendments* are applied prospectively." *Lawrence v. Anheuser—Busch, Inc.*, 523 A.2d 864, 869 (R.I.1987). (Emphasis added.) From and after the effective date of the 1994 amendments, all crime lab jobs were converted into so-called limited-appointment positions subject to URI's employment rules and practices. But government employees like Wilkinson who already had achieved classified full status under the merit system did not lose that classified full status merely because a position they held after achieving full status became a limited-term appointment on the effective date of the statutory amendment. The terms of particular crime-lab jobs may well have come to an end as of the result of the 1994

employees affected by a legislative repeal of statutory benefits were not required to forfeit any payments due them for work they already had performed; rather, they were suing to enforce their mere expectation at retirement of receiving future reemployment opportunities according to the statutory scheme as it then existed).

14. Neither URI nor the commission raised the defense of sovereign immunity with respect to this aspect of Wilkinson's claims, nor could they have done so successfully. The defendant URI has long been held amenable to suit. *See University of Rhode Island v. A.W. Chesterton Co.*, 2 F.3d 1200 (1st Cir.1993) and *Vanlaarhoven v. Newman*, 564 F.Supp. 145

(D.R.I.1983) (both holding that URI is not an alter ego of the state, and thus it cannot invoke the defense of sovereign immunity). Moreover, even assuming arguendo that the commission would qualify as an arm or an alter ego of the state, it could not avoid a claim seeking to vindicate a protected property interest in statutory employment benefits by invoking the doctrine of sovereign immunity. *See, e.g.,* R.I. Const. art. 1, sec. 16; see also *Pellegrino v. The Rhode Island Ethics Commission,* 788 A.2d 1119 (R.I.202) (holding that sovereign immunity does not protect the state from claims for statutory employment benefits that constitute a protected property interest).

amendments, but Wilkinson's classified full-status protection under the merit system survived those changes. "Only when 'it appears by clear, strong language or by necessary implication that the Legislature intended' a statute to have retroactive application will the courts apply it retrospectively." *Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.,* 640 A.2d 950, 954–55 (R.I.1994) (quoting *VanMarter v. Royal Indemnity Co.,* 556 A.2d 41, 44 (R.I.1989)).

Here, no specific language in the 1994 amendments supports defendants' position that these enactments retroactively stripped Wilkinson of his full-status employment. In the absence of such language, or indeed any evidence to the contrary, this Court will apply the general rule that "statutes operate prospectively from and after the effective date of the statute. It is only in the event that a statute contains clear and explicit language requiring retroactive application that a statute will be interpreted to operate retrospectively." *Avanzo v. Rhode Island Department of Human Services,* 625 A.2d 208, 211 (R.I.1993) (holding that attempt by governmental entity to apply a statute changing welfare eligibility requirements by establishing a limit on the length of time a totally incapacitated adult might receive benefits should not have been applied to existing recipients by counting benefit months prior to the effective date of the statute). Thus, the 1994 amendments affecting the status of crime lab employees are valid only for those employees who had not obtained a protected property interest in their full-status employment before the 1994 amendments. There is, therefore, no conflict between the 1994 amendments and the merit system necessitating the application of the "trumping" provision of § 43-3-26.

 The defendants also argue that, since 1971, Wilkinson always has been a nonclassified limited-term appointee under URI's employment policies and practices. This contention, however, completely ignores the District Court's ruling to the contrary in Wilkinson's 1993 appeal that reversed DES's refusal to award him unemployment compensation. This Court has held that the doctrine of collateral estoppel prevents the re-litigation of an issue actually litigated and determined between the same parties or their privies. *Casco Indemnity Co. v. O'Connor,* 755 A.2d 779, 782 (R.I.2000). "[F]or collateral estoppel to apply, three factors must be present: 'there must be an identity of issues; the prior proceeding must have resulted in a final judgment on the merits; and the party against whom the collateral estoppel is sought must be the same as or in privity with the party in the prior proceeding.'" *Id.* (quoting *Commercial Union Insurance Co. v. Pelchat,* 727 A.2d 676, 680 (R.I.1999)). All three of these elements are satisfied in this case. The defendants were parties to Wilkinson's action seeking unemployment compensation; at issue was what government entity actually employed Wilkinson, and what was his actual government-employment status. Finally, defendants, as they acknowledged at oral argument, never sought further review of the District Court's final judgment holding that Wilkinson was a commission employee who had achieved "full-status" protection in his job. Therefore, this Court will not entertain arguments concerning what entity employed Wilkinson or what type of state employment he held. As determined in the earlier District Court action, Wilkinson was never a URI employee, but was at all times a classified commission employee who had achieved full status or tenure in his job.

Moreover, defendants' counterclaims for reimbursement of tuition benefits and compensation were based on Wilkinson's

status as a classified employee of the commission, at least from 1978–1994. Because of the preclusive effect of the District Court's final judgment, and the tacit waiver of this issue in defendants' briefs, the Court will not, at this late date, entertain reargument on an issue that already has been decided and that defendants apparently have conceded. Moreover, we are in complete agreement with the District Court's interpretation of the applicable statute. Under the original crime lab act, Wilkinson was a classified employee of the commission, but not URI.

In sum, we hold that Wilkinson's classified full-status employment was not affected by the 1994 amendments. When he achieved this status in 1988, Wilkinson obtained a property interest in his continued employment with the commission such that he could not be terminated from state service except for cause, nor could he be "reorganized" into a different limited-term classification without paying him just compensation for taking his protected property interest in his full-status employment. Thus, when defendants declined to "reappoint" Wilkinson to a limited-term position in 1996 and refused to retain him as a classified full-status state employee, they violated the merit system, which prohibited them from dismissing Wilkinson from state service without cause to do so. Thus, as a matter of law, Wilkinson was entitled to a grant of summary judgment on this claim, and we vacate so much of the motion justice's summary judgment that is inconsistent with this determination.

## C. Wilkinson's Defamation Claims

■ Wilkinson also leveled defamation claims against the individual defendants, Luzzi and Hilliard. Luzzi's allegedly defamatory statements were contained in certain memoranda that he had sent to Wilkinson in 1991 and 1992.[15] The statements Hilliard allegedly uttered were similar to those of Luzzi, though he directed his remarks to the commission. The motion justice held that, in reviewing the allegedly defamatory statements, "the court can discern no defamatory meaning here" and that "at worst, [these] assertion[s] would seem to be privileged." The hearing justice granted summary judgment in favor of Luzzi and Hilliard.

■ We have held that it is for the court to decide whether a statement contains a defamatory meaning. *Swerdlick v. Koch,* 721 A.2d 849, 859 (R.I.1998) (citing *Healey v. New England Newspapers Inc.,* 520 A.2d 147, 150 (R.I.1987)). A defamatory statement consists of "[a]ny words, if false and malicious, imputing conduct which injuriously affects a [person's] reputation, or which tends to degrade him [or her] in society or bring him [or her] into public hatred and contempt * * *." *Swerdlick,* 721 A.2d at 860 (quoting *Elias v. Youngken,* 493 A.2d 158, 161 (R.I.1985)). After reviewing the record, we agree with the motion justice that all concerned had believed in good faith that Luzzi properly had been supervising Wilkinson—until the District Court held in 1993 that neither URI nor the Board of Governors were

15. The memoranda included (1) a memorandum dated October 4, 1991, requesting an accounting of vacation time; (2) a memorandum dated October 7, 1991, in which Luzzi expressed his belief that Wilkinson was employed by the Board of Governors; (3) a memorandum dated November 12, 1991, reprimanding Wilkinson for insubordination and requesting an accounting of time; (4) a mem-

orandum dated December 5, 1991, demanding Wilkinson's schedule; and (5) a memorandum dated January 8, 1992, informing Wilkinson that he was being dismissed for his insubordinate and unacceptable attitude and actions. The claims against Hilliard were substantially similar, except that they included a charge of violating a restraining order.

Wilkinson's employer. Moreover, the statements were, from both Luzzi's and Hilliard's point of view, substantially true.

In any event, regardless of whether it legally qualified as Wilkinson's employer in 1991 and 1992, URI had been intimately involved with the crime lab and its oversight from its inception. Although he was not statutorily authorized to serve as Wilkinson's supervisor, Luzzi acted in that capacity pursuant to URI's joint—albeit unauthorized—de facto control over crime-lab employees. And Hilliard was the director of the lab, and thus was Wilkinson's supervisor when he allegedly uttered his defamatory statements. Thus, even if their statements might have been defamatory in some other context, both Luzzi and Hilliard were entitled to the legal protection afforded to them as Wilkinson's de facto supervisors by the qualified privilege accorded to those who comment upon the job performance of individuals they supervise. *See Swanson v. Speidel Corp.*, 110 R.I. 335, 338, 293 A.2d 307, 309 (1972) (holding that statements in personnel files that would otherwise be defamatory are privileged). The allegedly defamatory statements related to Wilkinson's job performance, and Luzzi and Hilliard communicated them to Wilkinson himself, or to persons in a supervisory position over Wilkinson. Therefore, we hold, Luzzi's and Hilliard's statements were privileged. Discerning no material issues of disputed fact and no errors of law, we conclude that the motion justice properly granted summary judgment in favor of Luzzi and Hilliard on these claims.

## II

### Claims Disposed of at Trial

 The trial in this case proceeded on an agreed statement of facts and addressed two narrow claims. The first concerned Wilkinson's charge that Hilliard had violated the restraining order preventing him from taking any negative employment action against Wilkinson for refusing to clean a contaminated safe at the crime lab. The second involved defendants' alleged entitlement to reimbursement from Wilkinson for the benefits and compensation that Wilkinson had received between July 1978 and July 1994. The trial justice found no evidence that Hilliard had knowledge of the restraining order when he made certain statements to the commission (in the context of discussing whether to "reappoint" Wilkinson) that allegedly violated the restraining order. For conduct to constitute civil contempt, it must be "proved by clear and convincing evidence that a lawful decree was violated." *Durfee v. Ocean State Steel, Inc.*, 636 A.2d 698, 704 (R.I.1994) (quoting *Trahan v. Trahan*, 455 A.2d 1307, 1311 (R.I.1983)). The hallmark of civil contempt is the disobedience of a lawful decree. *Nelson v. Progressive Realty Corp.*, 81 R.I. 445, 448, 104 A.2d 241, 243 (1954). The trial justice found that Wilkinson had failed to prove by clear and convincing evidence that Hilliard was aware of the restraining order when he made the statements in question. Upon our review of the record, we cannot say that the trial justice erred in this determination. There is no evidence in the record to demonstrate that Hilliard knew about the restraining order, or that he had disobeyed it intentionally. Therefore, we affirm the trial justice's finding on this issue.

Furthermore, the trial justice found that there was no basis for defendants' counterclaims to recover the value of any benefits or other compensation bestowed on Wilkinson during the years he worked at the crime lab. As the trial justice observed "[t]he basis for the plaintiff's compensation and benefits during the time the defendants mention had little or nothing to do with the status of his employment or the

title of his employer. The defendants simply offered him salary and benefits based upon his position [at the crime lab] which the plaintiff accepted as part of his agreement to work."

■ In reviewing a trial justice's decision in a nonjury civil case, we will not disturb his or her factual findings "unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties." *Harris v. Town of Lincoln,* 668 A.2d 321, 326 (R.I.1995) (citing *Gross v. Glazier,* 495 A.2d 672, 673 (R.I.1985) and *Lisi v. Marra,* 424 A.2d 1052, 1055 (R.I.1981)). *See Paradis v. Heritage Loan and Investment Co.,* 701 A.2d 812, 813 (R.I.1997) (mem.). After examining the record, we conclude that the trial justice did not misconceive or overlook any material evidence in this regard. As a commission employee working at the crime lab that was supervised by URI personnel, Wilkinson received those benefits (including tuition assistance, salary, and a shortened work week) that also were offered to URI employees who did not work at the lab. No evidence suggested that this consideration was illegal or unwarranted—especially given the unauthorized but joint supervision of the lab by both URI and the commission. As the trial justice noted, these benefits were part and parcel of Wilkinson's employment package at the crime lab and Wilkinson's entitlement to them did not depend on whether URI was his employer. The trial justice properly refused to allow defendants to deny their joint control over the lab, or to recover the value of employment benefits that they freely had offered and provided to him, and that Wilkinson freely had accepted as part of his crime-lab employment. We do not believe that the trial

justice erred as a matter of law, or that he misconceived or overlooked material evidence, and we therefore affirm that portion of the judgment that rejected defendants' counterclaims.

### Conclusion

For these reasons, we reverse the motion justice's ruling concerning Wilkinson's classified full-status employment rights, vacate the summary judgment, and remand this case to the Superior Court for the entry of a summary judgment on liability in favor of Wilkinson and for further proceedings consistent with this opinion to determine Wilkinson's damages, including the back pay that defendants owe to him. Thereafter, an amended final judgment shall enter in favor of the plaintiff. Moreover, we hereby order that Wilkinson be reinstated to his position at the crime lab commensurate with his status as a classified full-status state employee, and that he receive all benefits that he was and remains entitled to receive in that capacity, as if he had not been terminated, less any compensation that he may have received from other sources that he would not otherwise have earned but for his wrongful termination. Moreover, in the future, although he shall be subject to URI's supervision and employment practices to the extent they are not inconsistent with his tenured status as a classified state employee, Wilkinson shall be entitled to receive the full panoply of due-process rights associated with his classified full-status employment. This part of our holding will become relevant if URI, the commission, or the state again attempt to terminate Wilkinson's employment. In addition, any grievance Wilkinson may have with the procedures implemented by URI after his reinstatement should be directed to the PAB, which has jurisdiction over Wilkinson as a classified employee. Nothing in this opinion, however, should be construed

to prohibit Wilkinson's employer from seeking to discipline or to remove him from state service for cause in accordance with the merit system. We also deny and dismiss (1) Wilkinson's appeal of the judgment denying his contempt claim and (2) the defendants' counterclaims for reimbursement. And we reiterate that all of Wilkinson's claims not explicitly addressed in this opinion have been deemed waived and are therefore denied.

Chief Justice WILLIAMS and Justice BOURCIER did not participate.