James O. OPELLA

v.

Ilan I. OPELLA.

No. 2004–380–Appeal.

Supreme Court of Rhode Island.

May 5, 2006.

Dean G. Robinson, East Providence, for Plaintiff.

Bruce R. Thibodeau, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

The plaintiff, James O. Opella, appeals from a judgment in favor of his father, the defendant, Ilan I. Opella, in this dispute over money.[1] This case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not be decided summarily. After considering the written and oral submissions of the parties and examining the

record, we are of the opinion that the issues raised in this appeal may be resolved without further briefing or argument. For the reasons set forth herein, we affirm the judgment of the Superior Court.

## Facts and Procedural History

This case has its genesis in various sums of money that defendant and his late wife, Margie Inez Opella, advanced to plaintiff. According to defendant, between 1985 and 1994, he paid approximately $68,000 to plaintiff or to other persons on plaintiff's behalf. In a telephonic deposition, portions of which were read into the record, defendant testified that he, his wife, and plaintiff all considered the payments to be loans and that plaintiff had said that he would pay the money back. In addition, defendant and his wife kept receipts and summary lists of all payments to plaintiff that they considered to be loans. James Opella testified, however, that he never made any promises to pay back the money; rather, he considered the payments to be gifts.

In June 1985, plaintiff was incarcerated after a conviction for possession of a controlled substance, cocaine, with intent to deliver. He was released on bail from December 26, 1985, until January 1990, and was then again incarcerated, this time until April 1991. On December 30, 1985, while out on bail, plaintiff signed a promissory note for $16,000 payable to his father. The plaintiff explained that he signed the note at the insistence of his mother, just in case anything should happen to him, so that his parents could recover the money that they had paid to help him with his house.

---

1. Both parties are residents of Texas. The defendant does not contest the *in rem* jurisdiction of the Superior Court over this action.

See *Shaffer v. Heitner*, 433 U.S. 186, 207–08, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

On March 28, 1990, plaintiff signed a second promissory note for $100,000 payable to his parents. The plaintiff testified that this second note was his idea, to protect two properties that he owned.[2] This second note was secured by a mortgage, executed on the same date, encumbering two properties plaintiff owned, 408 Cranston Street and 81 Sycamore Street in Providence. Both the note and the mortgage specified a rate of interest of 12 percent per annum. The plaintiff testified that he considered the documents to represent a "blanket lien" on the properties, rather than a "loan." He said that he trusted his parents and viewed the note as "nothing more than paperwork" that would protect them and the properties if he died. In contrast, defendant said that he understood the $100,000 promissory note to cover all payments that he and his wife had provided to plaintiff since 1985, plus any future advances. It is undisputed that plaintiff was incarcerated at the Adult Correctional Institutions when he executed this second promissory note and mortgage on March 28, 1990.

On January 3, 1995, well after plaintiff's release from prison in 1991, defendant and his wife signed a partial release of the mortgage, thereby discharging the encumbrance on the Cranston Street property so that plaintiff could sell it. The release specifically stated that it would have no effect on his parents' right to collect on the Sycamore Street property.[3] A portion of the proceeds from the sale of the Cranston

Street property was paid to plaintiff's parents. The plaintiff testified that he consented to this payment, which he characterized as "gratitude for all the help [he had] been given."

The plaintiff's mother died in 1998, bequeathing by will her entire estate, including her interest in the $100,000 note and mortgage, to defendant. In 2000, plaintiff entered into a purchase and sales agreement to sell the Sycamore Street property. The plaintiff retained Attorney George Landes to represent him in the sale. After discovering the existence of the mortgage lien on the property, Mr. Landes contacted Stanley Cramb, an attorney in Texas who was representing defendant, to discuss the matter.

On September 14, 2000, Mr. Landes wrote a letter to Mr. Cramb, notifying him that plaintiff was confident that the amount advanced to him by his parents was far less than $100,000, the amount appearing on the note and mortgage documents. The letter further stated that the mortgage deed had been executed by plaintiff while he was serving a prison sentence, thus "in effect nullifying such conveyances" under Rhode Island statutory law. In a September 28, 2000 letter, Mr. Cramb responded that despite his belief that the Rhode Island law prohibiting prison inmates from conveying property did not apply, defendant had "decided to once again try to help his son." The letter went on to inform plaintiff's attorney that:

> "But this release shall not in any way affect or impair the right of said Margie Inez Opella and Ilan I. Opella to hold under the said mortgage deed as security for the sum remaining due thereof or to sell under the power of sale in said mortgage deed contained all the remainder of the premises therein conveyed and not hereby or heretofore releases or otherwise enforce the provision of said mortgage."

**2.** The plaintiff testified at trial that the idea to create the second note was his. In his written submission to this Court, however, he claims that he signed the note "reluctantly" and at defendant's "sole insistence."

**3.** The partial release was introduced for identification, but was not made a full exhibit at trial. The plaintiff read the third paragraph of the partial release into the record as follows:

"My client is willing to forgive the mortgage loan indebtedness and release his lien against your client's property in Rhode Island if your client will sign a general release releasing my client from any possible or potential liability as a result of your client's execution of the said mortgage loan documentation against his property. Please let me know if this proposal is acceptable to your client. If it is, please also send me the necessary documentation to release and discharge the mortgage lien against your client's property and to discharge the loan indebtedness. In turn, I will send to you a General Release of Liability to be signed by your client."

On October 11, 2000, Mr. Landes wrote back to Mr. Cramb, stating, "[m]y client is in agreement with your client's proposal of September 28, 2000," and indicating that he was mailing a discharge of the mortgage for defendant to sign.

The record reflects that further correspondence was exchanged between the attorneys, and that plaintiff signed a "Mutual Release Agreement" on November 21, 2000. Then, in a December 21, 2000 letter, defendant, through a newly secured Rhode Island attorney, Alfred Thibodeau, informed Mr. Landes that he was unwilling to execute the mutual release and was seeking recovery of the payments that he and his wife had made to plaintiff from 1985 to 1994.

On November 13, 2001, plaintiff filed a complaint in Superior Court, alleging that the note "lacked the consideration recited and the mortgage was improperly recorded" in the land evidence records, and that defendant's actions or inactions in failing or refusing to execute the release and mortgage discharge were wrongful and continued to cloud the title to the Sycamore Street property. He also sought specific performance of the alleged agreement to settle. On December 14, 2001, defendant answered and filed a counterclaim alleging that plaintiff was indebted to him for the money paid to plaintiff or others on his behalf. The defendant averred that the $100,000 promissory note was valid for the repayment of sums advanced or to be advanced in the future, and that the mortgage secured by the Sycamore Street property was recorded properly on April 2, 1990. Each party also sought costs and attorney's fees.

After a nonjury trial, the trial justice found that the payments by defendant and his wife to plaintiff throughout the years "were loans and not gifts." In addition, he found that the promissory note, as well as the mortgage that plaintiff executed while in prison, were valid instruments. Finally, the trial justice found that the parties did not form a binding contract to settle because there "was never a meeting of the minds between the two."

Judgment was entered on November 10, 2004, which, *inter alia,* ordered plaintiff to repay defendant at a rate of 12 percent per annum "that amount ($32,000.00 or thereabouts) that was loaned to James Opella by Ilan and Margie Inez Opella prior to the execution of the promissory note, or March 28, 1990," and "that amount that was loaned * * * after the execution of the promissory note * * * without any interest accruing." The plaintiff also was held responsible "for all costs and attorney's fees incurred by Ilan Opella regarding this matter."

On appeal, plaintiff challenges the following rulings of the trial justice: (1) that plaintiff must repay all the funds that defendant and his late wife paid to him because they were loans, and not gifts; (2) that the $100,000 promissory note was valid; (3) that the mortgage securing said note was a valid security interest in the Sycamore Street property; and (4) that

the parties had not entered into a valid contract to execute a mutual release for the discharge of the mortgage indebtedness.

## Standard of Review

"In reviewing a trial justice's decision in a nonjury civil case, we will not disturb his or her factual findings 'unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.'" *Bogosian v. Bederman*, 823 A.2d 1117, 1120 (R.I.2003) (quoting *Wilkinson v. State Crime Laboratory Commission*, 788 A.2d 1129, 1144 (R.I.2002)). We also "will not disturb determinations of credibility in a non jury trial unless the findings are clearly wrong or the [trial justice] misconceived or overlooked material evidence." *Id.* (quoting *Andreozzi v. Andreozzi*, 813 A.2d 78, 82 (R.I.2003)). It is not this Court's task to weigh credibility; rather, "[t]he task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." *Id.* (quoting *Walton v. Baird*, 433 A.2d 963, 964 (R.I. 1981)). "We must therefore consider all the facts, circumstances, and pleadings to determine whether the Superior Court justice's findings were clearly wrong and thereby constitute reversible error." *Forte Brothers, Inc. v. Ronald M. Ash & Associates, Inc.*, 612 A.2d 717, 721 (R.I. 1992).

## Discussion

The plaintiff's first argument on appeal is that the trial justice was clearly wrong in finding that the sums of money forwarded to plaintiff from his parents were loans, and not gifts. The evidence presented at trial conflicted concerning whether the payments provided to plaintiff were intended as loans or gifts. The plaintiff testified that the payments of money were gifts because his parents never indicated that any of the payments were loans and he never made any promises to repay them. According to defendant, however, all three individuals considered the advances to be loans.

The trial justice said that he was satisfied that the sums defendant and his wife transferred to plaintiff "were loans and not gifts." Focusing on the two promissory notes plaintiff executed in favor of his parents as evidence that the payments were intended to be loans, he found the testimony of plaintiff "to be lacking in credibility or plausibility." The trial justice also considered the fact that defendant had kept meticulous records of the payments to plaintiff as further proof that they were not gifts.

In short, the trial justice found defendant's evidence to be more persuasive than plaintiff's evidence. This Court has upheld trial justices' determinations of fact in similar circumstances when the evidence presented at trial was contradictory. *See, e.g., Kobelecki v. Kobelecki*, 706 A.2d 1322, 1323–24 (R.I.1997) (mem.); *Holding v. Holding*, 82 R.I. 474, 475–76, 111 A.2d 476, 476–77 (1955). Affording these credibility determinations and factual conclusions the deference they are due, we are satisfied that the trial justice was not clearly wrong in finding that the payments that defendant and his wife provided to plaintiff were loans.

Next, plaintiff challenges the trial justice's ruling that the March 28, 1990 promissory note executed by plaintiff in favor of defendant and his wife was valid. He emphasizes that the evidence at trial indicated that the note had a face amount of $100,000, whereas defendant testified that only about $68,000 actually was

"loaned" to plaintiff.[4] He argues that the difference of $32,000 between the note's face amount and the actual amount advanced "could only have constituted interest," meaning that the note contained a 32–percent rate of interest, which is prohibited by G.L. 1956 § 6–26–2. The plaintiff alleges that the note was usurious, and therefore null and void.

Section 6–26–2(a) prohibits loan interest rates that exceed 21 percent per annum. Any contract in which the yearly interest rate exceeds this maximum permissible rate is expressly declared void by § 6–26–4(a). The promissory note at issue in this case, however, clearly stated a rate of interest of 12 percent per annum on its face. The trial justice determined that the 12–percent interest attached only to the loans received by plaintiff before the note was executed, "$32,000.00 or thereabouts," less the partial release amount connected with the sale of the Cranston Street property. He also ruled that recovery of the funds paid to plaintiff after the note was executed would be without interest. The trial justice's decision in this regard was not clearly erroneous; nor did he overlook or misconceive material evidence.

■ The plaintiff also contends that the trial justice erred when he found that the mortgage securing the promissory note was valid. He argues that § 13–6–3 rendered the transaction void because plaintiff was incarcerated when the mortgage was executed and thus could not effectuate a conveyance of property absent Superior Court permission. Section 13–6–3 provides that:

"No person who shall be sentenced to imprisonment in the adult correctional institutions shall have any power, during his or her imprisonment, to make a will, or any conveyance of his or her property, or of any part of that property, except by permission of the superior court granted on petition for that power, and *on the notice and terms, if any, that the court shall prescribe.*"

Applying equitable principles, the trial justice noted that it was plaintiff's idea to execute a mortgage and that after his release from prison he relied on it "as if it were a valid document" when he secured a partial release from his parents so that he could sell the Cranston Street property. It appears to us, however, that the issue of the mortgage's validity has become moot since the filing of this appeal. In his supplemental memorandum, defendant represents that the Sycamore Street property has been sold and that he "was paid pursuant to the Mortgage and the Superior Court's decision." Accordingly, he has signed and forwarded a discharge to the closing attorney. In light of the trial justice's ruling that the note itself was valid and the monies advanced were indeed loans, the validity of the mortgage *vel non* no longer has any relevance to this controversy.[5]

■ Finally, plaintiff contends that the trial justice erred in finding that there was no contract between plaintiff and de-

---

4. It should be noted that, in his deposition testimony admitted at trial, defendant said that the entire amount he actually had loaned to his son was approximately $68,000. The defendant later said, however, that the amount actually loaned to plaintiff up to the moment in time when the parties executed the $100,000 promissory note was approximately $32,000.

5. Even if this issue were not moot, we are satisfied that the trial justice did not err by applying equitable principles to preclude plaintiff from denying the validity of a mortgage that plaintiff admitted was his idea to execute. *See East Greenwich Institution for Savings v. Kenyon,* 20 R.I. 110, 112–14, 37 A. 632, 633–34 (1897).

fendant to execute the mutual release and mortgage discharge. For parties to form an enforceable contract, there must be an offer and an acceptance. Each party must have and manifest an objective intent to be bound by the agreement. *Weaver v. American Power Conversion Corp.*, 863 A.2d 193, 198 (R.I.2004). For either an express or implied contract, "a litigant must prove mutual assent or a 'meeting of the minds between the parties.'" *Mills v. Rhode Island Hospital*, 828 A.2d 526, 528 (R.I.2003) (mem.) (quoting *J. Koury Steel Erectors, Inc. of Massachusetts v. San–Vel Concrete Corp.*, 120 R.I. 360, 365, 387 A.2d 694, 697 (1978)).

In the present case, the trial justice found that although there were negotiations between the parties' attorneys, there never was a meeting of the minds between the parties themselves. Crediting the testimony of Ilan Opella, the trial justice found the defendant to be an elderly gentleman who was undergoing a great deal of emotional turmoil and was confused. He further found that the defendant never manifested his assent to the settlement agreement, and thus there never was a meeting of the minds. Again, according the great deference to which the trial justice's credibility determinations and factual findings are entitled, we cannot say that he was clearly wrong.

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court, to which court the record in this case shall be remanded.