DECISION
Before this Court are Plaintiffs' Motion to Reconsider ("Motion") the July 31, 2009 Decision of the above-referenced matter and Defendant's Motion to Lift Temporary Restraining Order ("TRO"). After issuing its July 31, 2009 opinion, but before entry of a final order, this Court determined that it would consider revisiting the Decision if so sought by the parties. After reconsideration, this Court holds that the applicable timeframe for attorneys' fees related to Defendant's delayed production of the 1999-2004 Trust accounting shall encompass September 28, 2004 through August 3, 2006. In addition, this Court finds that applying prejudgment interest to the disgorgement award is appropriate. All other substantive matters contained in the July 31, 2009 Decision shall remain the same. As to Defendant's Motion, this Court declines to lift the TRO until Defendant complies with the forthcoming final order.
 I Facts and Travel[1]
In April 1998, Diane Sargent ("Diane") established a revocable trust ("Trust"), named herself as Trustee, and named her daughter Pamela Sargent ("Pamela" or "Defendant") as *Page 2 
successor trustee. After Diane died on November 26, 1999, Pamela received most of her quarter share of the Trust outright per the Trust's instructions[2] and commenced trustee duties as to the remaining three quarter-shares, which were held in trust for Diane's three other children: Lisa, Jeffrey, and Kennett. The Trust directed Pamela to administer a hybrid support/discretionary trust[3] for her siblings, Lisa and Jeffrey, and a "special needs trust"[4] for her brother, Kennett.
Due to Pamela's allegedly improper actions and inactions as Trustee, Jeffrey and Kennett filed Kennett F. Sargent andJeffrey P. Sargent v. Pamela M. Sargent, C.A. No. PC04-3674, on July 7, 2004, seeking a court order that would require Pamela to provide an accounting of the Trust assets and remove her as trustee. Though declining to remove Pamela from her Trustee post, this Court entered a Consent Order on September 28, 2004 ("2004 Order"), requiring Pamela to provide an accounting of the 1999-2004 Trust transactions within thirty (30) days of this Court's decree. Pamela did not make haste to comply with the 2004 Order. It was not until August 3, 2006 and after two insufficient accountings, that Pamela submitted a sufficient *Page 3 
"preliminary accounting" of the Trust transactions that occurred between 1999 and 2004.[5] Thereafter, on May 8, 2007, brothers Jeffrey and Kennett renewed their request to remove their sister, Pamela, as the trustee. Before this Court could intervene, Pamela resigned on September 14, 2007, and Coastline Trust Company ("Coastline") and Francis Sargent ("Francis"), the father of the four siblings, were appointed as successor Co-Trustees of the Trust ("Co-Trustees" or "Coastline and Francis" or "Plaintiffs").
On or about January 31, 2008, the new Co-Trustees requested guidance from this Court as to the distribution of the remaining Trust assets. Coastline and Francis suggested that the Trust should immediately pay Jeffrey and Kennett the difference between the amounts Pamela had already distributed to them and the $335,960 that Pamela had distributed to herself outright. This Court ultimately adopted the Co-Trustees' recommendation, and the requested assets were disbursed to Jeffrey and Kennett free of the Trust. Accordingly, on or about January 31, 2008, Jeffrey, Kennett, and Pamela had each received $335,960 as their distributive Trust share.[6] This Court also issued an accompanying Order ("2008 Order"), compelling Pamela to complete a final accounting of the Trust for the entire time period she was the trustee — November 1999 through September 2007.[7] *Page 4 
On March 10, 2008, the Co-Trustees brought their own suit against Pamela in the instant action, C.A. No. PC08-1429. In their nine-count, verified complaint, they alleged that Pamela had breached duties of care and loyalty during her tenure as Trustee and had acted with malice or, at least, gross negligence in her administration of the Trust. Soon after filing the Complaint, the Co-Trustee Plaintiffs sought and obtained a Temporary Restraining Order ("TRO") against all of Pamela's assets. The TRO was amended four times, and the final TRO issued on November 18, 2008. Ultimately, the TRO permitted Pamela to access her assets for normal household uses and business expenses reimbursable by her employer and also allowed Pamela to redeem $40,000 of her assets to pay her attorneys' fees and $5000 to use for discretionary spending. All of Pamela's other assets were frozen pending further action in this Court.
The Co-Trustee-initiated trial commenced on February 17, 2009 before this Court, sitting without a jury. This Court issued a written Decision on July 31, 2009. Briefly, this Court found that Pamela had breached various duties to the Trust and its beneficiaries, justifying disgorging Pamela of the $43,628 she had received as payment for her trustee services. This Court also held that Pamela had willfully disobeyed the 2004 Order by not providing the 1999-2004 accounting of the Trust within thirty days of September 28, 2004. The Co-Trustee Plaintiffs, on behalf of the Trust, were awarded damages in the amount of Pamela's disgorgement and reasonable attorneys' fees related to the efforts necessary to compel Pamela to comply with the 2004 Order. In addition, this Court awarded Jeffrey and Kennett the balance of the Trust, stating its intention to make Jeffrey and Kennett whole as to the amount of their inheritance intended by Diane. Although each brother had received a disbursement from the Trust on or about January 31, 2008, after Francis and Coastline became the successor Co-Trustees, these amounts were only intended to make the brothers' total receipt from Trust equivalent to Pamela's outright share of $335,960. *Page 5 
Based on the Trust's original corpus, however, each Sargent sibling was entitled to receive a quarter share equal to $400,000.[8]
Accordingly, though Jeffery and Kennett already had redeemed $335,960 from the Trust, they were each still short $64,040. By awarding the Sargent brothers the proceeds remaining in the Trust account, supposedly containing $141,191, this Court anticipated that each brother would receive the half of its balance, or $70,595.50, which would provide the $64,040 necessary to round each brother's total receipt from the Trust to $400,000, and also give Jeffery and Kennett an additional $6555.50 each as equitable relief.
Thereafter, on September 1, 2009, this Court issued an Order ("2009 Order") that requested that Plaintiffs submit invoices reflecting the attorneys' fees spent from September 28, 2004 through October 14, 2005 as related to the "draft accounting." This Court's 2009 Order also stated that it would reconsider the July 31, 2009 Decision if a party submitted a Motion for Reconsideration by September 15, 2009. Plaintiffs accepted this Court's offer for reconsideration, and on September 15, 2009, they filed the instant Motion to Reconsider. As such, a final judgment was not entered.
Plaintiffs' instant Motion requested this Court to revisit seven areas of law or fact within the July 31, 2009 Decision. Specifically, Plaintiffs argue that this Court (1) incorrectly stated that Pamela had relied on her financial advisor, A.G. Edwards ("AGE"), to make investment decisions for the Trust's brokerage account[9] — including decisions regarding the proportion of *Page 6 
Qualcomm Corporation holdings — and then based on this incorrect premise, held that Pamela was insulated from liability for the failure to diversify; (2) incorrectly held that Pamela's failure to diversify the brokerage account, which resulted in losses, was mitigated by gains in other brokerage holdings pursuant to G.L. 1956 § 18-15-2(b); (3) failed to fashion an equitable remedy for Jeffrey and Kennett, whereby this Court did not explicitly compensate the Sargent brothers for the time value of money lost due to the delay in receiving their total distributive shares, did not award prejudgment interest, and awarded Jeffery and Kennett the remaining funds in the Trust account, which were significantly less than this Court believed them to be ($141,191 vs. $1,429.01); (4) incorrectly held that Pamela did not act with malice; (5) improperly tailored attorneys' fees to the efforts necessary to compel Pamela to provide the draft accounting of the Trust, rather than the fees incurred to compel Pamela to provide the full and fair accounting; (6) improperly denied punitive damages; (7) improperly found that Pamela did not breach her duty to act impartially.
On October 5, 2009, this Court permitted both parties to be heard on the issues for reconsideration and regarding the TRO placed on Pamela's assets. Of the seven areas that Plaintiffs' Motion to Reconsider requests this Court to revisit, Plaintiffs' memorandum and oral argument expounded substantively only on four issues.[10] *Page 7 
 II Analysis A The Motion to Reconsider
In its 2009 Order, this Court stated it would reconsider its July 31, 2009 Decision if so requested by a party. Plaintiffs submitted a Motion to Reconsider on September 15, 2009. As such, the July 31, 2009 Decision did not become an appealable, final judgment. See Morris v. City of Hobart,39 F.3d 1105, 1110 (10th Cir. 1994) (holding that the case was dismissed with prejudice (a final disposition) because neither party acted in accordance with a closing order that gave the parties sixty days to reopen the proceedings or else face dismissal). It is well-settled that "a litigant `cannot appeal from a statement of intention to enter a judgment as distinct from the judgment itself.'" Foremost Sales Promotions, Inc. v. Director, Bureau ofAlcohol, Tobacco Firearms,812 F.2d 1044, 1045 (7th Cir. 1987) (quoting Azeez v.Fairman, 795 F.2d 1296, 1297 (7th Cir. 1986)); seealso UAG West Bay AM, LLC v. Cambio,987 A.2d 873, 878 (R.I. 2010) (restating that "[u]ntil a judgment is entered, no appeal can be taken, and an appeal filed before the entry of judgment on a separate paper is premature and subject to dismissal." (quoting McClellan v. Thompson,114 R.I. 334, 341, 333 A.2d 424, 428 (1975))); Rose v. CentraliaTwp. High Sch. Dist. No. 200,375 N.E.2d 1039, 1040-41 (Ill. App. 1978) (stating that "substance, not form, determines whether trial court's order is final" and acknowledging that the court had specifically permitted the parties to amend a final order). As this Court expressly stated that it would stay the entry of final judgment if a party submitted a Motion for Reconsideration within the allocated timeframe, and because Plaintiffs properly filed such a motion, this case remains pending. Accordingly, this Court retains jurisdiction to evaluate Plaintiffs' September 15, 2009 Motion to Reconsider and Defendant's opposition thereto. See Oury v. Annotti,113 R.I. 506, 512, 324 A.2d 325, 329 (1974) ("An application to reopen prior to entry of judgment is *Page 8 
essentially addressed to a trial justice's sound judicial discretion, particularly in a non-jury case, and, absent an abuse thereof, an exercise of that discretion will not be disturbed on review.") (emphasis added); see also DeMelo v.Zompa, 844 A.2d 174, 176 (R.I. 2004) (citing Oury and recognizing a trial court's discretion to reopen a case for further evidence prior to final judgment).
This Court is mindful that the Superior Court Rules of Civil Procedure, like the Federal Rules of Civil Procedure, do not include a motion to reconsider. Sch. Comm. of the City of Cranston v.Bergin-Andrews, 984 A.2d 629, 649 (R.I. 2009). At the same time, this Court, in noting its governance by the "liberal rules of civil procedure," looks to "substance not labels." Sarni v.Melocarro, 113 R.I. 630, 636, 324 A.2d 648, 651-52 (1974);see also Bergin-Andrews, 984 A.2d at 649 ("This Court, however, applies a liberal interpretation of the rules to `look to substance, not labels.'") (internal citation omitted). To that end, this Court will exercise its discretion to review the Parties' submitted materials and this Court's prior determinations of law and fact prior to entering a final judgment. Oury,113 R.I. at 512, 324 A.2d at 329.
Of the seven areas for which the Plaintiffs' Motion requests reconsideration, Plaintiffs' memorandum and oral argument addresses only four issues substantively. This Court notes that our Supreme Court has held that issues raised "without a meaningful discussion thereof or legal briefing . . . does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." Catucci, 866 A.2d at 516 (quotingWilkinson v. State Crime Laboratory Comm'n,788 A.2d 1129, 1132 n. 1 (R.I. 2002) (holding that where Plaintiff "lists twelve different specifications of error on appeal, the majority of them [that] are not discussed in the body of his brief" are deemed waived))). Accordingly, this Court focuses its review only on those four issues expounded upon by the parties: (1) the relationship between AGE's *Page 9 
discretionary authority to invest and Pamela's alleged failure to diversify; (2) the application of § 18-15-2(b) to Pamela's alleged failure to diversify; (3) the Sargent brothers' equitable remedy; and (4) the time frame for attorneys' fees related to Plaintiffs' compelling Pamela to complete the Trust accounting. This Court therefore will not address these three other issues raised — malice, punitive damages, duty to act impartially — but not expounded upon in Plaintiffs' memorandum or oral argument. The ruling on these three issues shall remain unchanged from this Court's July 31, 2009 Decision. Ancillary to the matters developed in Plaintiffs' Motion to Reconsider, this Court will determine whether prejudgment interest applies to Plaintiffs' disgorgement award. This Court will also rule on Defendant's Motion to lift the TRO on Pamela's assets.
 1 Qualcomm Corporation Stock Retention and Sale
When Pamela assumed the trustee role after Diane's death on November 26, 1999, the Trust's AGE brokerage account was valued at $2,024,300. At this time, the account included 1600 shares of Qualcomm Corporation valued at $384.69 per share. In total, the Qualcomm Corporation stock was worth $615,500 and encompassed 30.4% of the entire AGE portfolio. One month later, on December 31, 1999, the stock split 4-for-1, and the price per share was decreased accordingly. On May 26, 2000, the alternate valuation date, [11] the Trust held 6400 shares of Qualcomm Corporation (due to the 4-for-1 stock split) with a per share value of $66.18 *Page 10 
and a total value of $423,600. The AGE account on that date was worth $1,941,302, and the Qualcomm Corporation stock constituted 21.8% of the portfolio.
In order to raise cash necessary to pay the Trust's debts, estate taxes, and administrative expenses, Pamela sold all the Qualcomm Corporation stock — upon the advice of her AGE broker-on July 25, 2000 at $58.92 per share for a total of $377,091. (Trial Tr. 20:22-21:8, Feb. 20, 2009.) The proceeds from the sale were $238,408 less than the value of the Qualcomm Corporation stock on Diane's date of death and $46,464 less than the value of stock at the alternate valuation date. During the trial, Plaintiffs argued that Pamela's failure to reduce the Qualcomm Corporation stock concentration from 30.4% to 5%[12] within one month of becoming trustee was imprudent and violated her duty to diversify. Plaintiffs requested that Pamela reimburse the Trust for the opportunity cost of the stock — the difference in value between the proceeds of the sale had Pamela sold the stock within a month of November 26, 1999 and the proceeds Pamela actually received when she sold the stock on July 25, 2000, eight months later.
 i AGE's Discretionary Authority and Pamela's Duty ToDiversify
In their instant Motion, Plaintiffs assert that this Court erroneously found that Pamela was excused from liability for failure to diversify because she relied on the discretionary authority of AGE to invest the brokerage account funds. Plaintiffs continue that AGE did not have this authority and this Court erred in stating that "Like many people without investment experience, Pamela left the investment decisions, including the decision to retain the Qualcomm stock during the relevant period, to her financial advisor." Sargent, No. PC08-1429, 2009 WL 3328560. Plaintiffs further contend that this Court's finding — [t]here [was] no evidence that Pamela took affirmative steps to limit her investment advisor's discretionary authority" — is contradicted by *Page 11 
the record. For support, Plaintiffs direct this Court to previously admitted evidence entitled AGE's "Trustee Agreement and Certification of Trust Investment Powers." This Exhibit, Plaintiffs contend, was signed by Pamela, but lacked a "Power of Attorney" attachment. As such, Plaintiffs claim that Pamela did not execute the proper formalities to successfully vest discretionary investment authority in AGE. Plaintiffs acknowledge that Pamela did consult AGE as to some Trustee duties — namely, which stocks to liquidate when she needed to raise cash — but maintain that Pamela cannot use her reliance on AGE in other areas to exculpate her from liability for her decision to maintain a disproportionate, 30.4% ratio of Qualcomm Corporation stock in the AGE account.
Though not creating a de jure investment advisor — one who is in technical compliance with the formality of executing a power of attorney along with the Trustee Agreement and Certification of Trust Investment Powers with AGE — Pamela heavily relied on the AGE advisor's discretion. This time period was admittedly one when "the transition from one broker to another was causing delay and confusion" for Pamela. After becoming Trustee, Pamela queried her AGE broker almost immediately (on December 8, 1999) for information regarding the account's date of death value for estate tax purposes. Her first concern was to raise cash with which to pay the estate taxes that would soon become due. In accordance with prudent trustee decision-making, Pamela requested guidance from AGE within the eight months prior to the sale of the Qualcomm stock as to which stocks to sell in order to pay the taxes. To that end, she "directed her investment advisor at [AGE] to review the portfolio and recommend a strategy for raising cash." Sargent, No. PC08-1429, 2009 WL 3328560. Ultimately, upon AGE's recommendation, she appropriately "dilute[d] a concentrated position [of Qualcomm Corporation stock] . . . to pay administrative expenses." 4 Austin Wakeman Scott, William Franklin Fratcher, *Page 12 
Mark L. Ascher, Scott and Ascher onTrusts § 19.3.2 at 1443-44 (5th ed. 2007) [hereinafterScott Ascher].
It has been found that in "some situations, an advisor's influence may be so great that it confers effective discretionary authority. . . ." Liss v. Smith,991 F. Supp. 278, 302 (S.D.N.Y. 1998). With respect to Pamela's taking affirmative steps to limit such discretion by not executing the power of attorney along with the Trustee Agreement and Certification of Trust Investment powers, this Court finds Pamela's de jure failure to execute said power of attorney constituted nothing more than her continuation of her mother's investment relationship with AGE. That same maintenance of the status quo also was evidenced by Pamela's retention of her mother's counselor.
It has been recognized that "[i]f a broker has acted as an investment advisor, and particularly if the customer has almost invariably followed the broker's advice, the fact finder may consider this as evidence that the relationship is discretionary." Patsos v. First Albany Corp.,741 N.E.2d 841, 850 (Mass. 2001) (citingLeboce, S.A. v. Merrill Lynch, Pierce, Fenner Smith, Inc.,709 F.2d 605, 607-608 (9th Cir. 1983)). For example, "[c]ourts have looked to both the documentation of the customer's account, as well as to the execution of particular account transactions, to determine whether the customer has entrusted a broker to manage his investments for his benefit." Patsos,741 N.E. 2d at 850 (citing Paine, Webber, Jackson Curtis,Inc. v. Adams, 718 P.2d 508, 516 (Colo. 1986)). With respect to the relationship between a stockbroker or financial advisor and his client, in the analogous context of finding a fiduciary duty, "if the client has requested the broker or advisor to provideinvestment advice or has given the broker discretion to select his or her investments, the broker or advisor [has even been found to] assume[] broad fiduciary obligations that extend beyond the individual transactions." *Page 13 Johnson v. John Hancock Funds,217 S.W. 3d 414, 428 (Tenn. Ct. App. 2006) (internal citations omitted) (emphasis added).
This Court, on the evidence before it, found that Pamela, who lacked investment experience, left the decisions on investing, including the decision to retain and to sell the Qualcomm stock, to her investment advisor. This Court recognizes that "[a]n inexperienced or naive investor is likely to repose special trust in [her] stockbroker because [she] lacks the sophistication to question or criticize the broker's advice or judgment." Patsos,741 N.E.2d at 851. Here, Pamela remained in close contact with AGE and consulted the brokerage company when making decisions. For example, after consulting with her AGE broker who advised her that the Qualcomm Corporation stock was the appropriate holding to liquidate in order to raise cash, she did so and eliminated all disproportionate concentrations of stocks held in the AGE portfolio. Indeed, "a touchstone for determining control is whether an investor has sufficient intelligence and understanding to evaluate the recommendations of a broker and to reject an investment opportunity if he or she regards it as unsuitable." Rowe v.Morgan Stanley Dean Witter, 191 F.R.D. 398, 408 (D.N.J. 1999). Even if an account is non-discretionary, a broker may exercise "de facto control" if an investor places his trust and faith in a broker and routinely follows the advice of his broker.Id. at 407 (citation omitted). Accordingly, although the account lacked the technical formalities to create a de jure discretionary relationship, this Court was and remains satisfied that Pamela allowed AGE to execute de facto control over this technically non-discretionary account, in essence relying on AGE's discretion.
 ii Pamela's Duty To Diversify
Additionally, Plaintiffs challenge this Court's decision not to compensate the Trust for the depreciation in the Qualcomm Corporation stock. At trial, Plaintiffs argued that Pamela *Page 14 
breached her duty to prudently invest because she failed to diversify the Qualcomm Corporation holdings in the Trust's AGE brokerage account within one month of becoming Trustee. As such, Plaintiffs demanded that Pamela reimburse the Trust for the diminution in value of the Qualcomm Corporation stock cause by her alleged breach.
In its July 31, 2009 Decision, this Court first determined that it would not adopt a "per se rule" for diversification that would require every trustee to reduce any concentration of holdings to below 5%, [13] regardless of circumstances. On the evidence before it, this Court held that it was not imprudent for Pamela to maintain a 30.4% concentration of Qualcomm Corporation stock for eight months after becoming the new Trustee. This Court found that Pamela had "reasonably determine[d] that, because of special circumstances, the purposes of the [T]rust [we]re better served without diversifying." Sargent, No. PC08-1429, 2009 WL 3328560 (quoting G.L. 1956 § 18-15-3). The "dot-com" bubble was still building during late 1999 through early 2000 and did not suddenly burst until spring 2000. In fact, the Qualcomm stock gained over 2000% of value during 1999. Like the majority of other investors during this time period including Standard Poor's, [14] Pamela did not appreciate the overvaluation of technology stocks and could not anticipate, without the benefit of hindsight, that the Qualcomm Corporation had reached the top of its market. As such, it was reasonable for Pamela to believe that the Qualcomm Corporation would continue to appreciate and likewise reasonable for Pamela to maintain a 30.4% concentration of its stock for only eight months while she sorted out the Trust affairs. There was no indication in the market that she needed to diversify the Qualcomm Corporation stock immediately or else face substantial losses. *Page 15 
From its July 31, 2009 Decision, this Court reiterates that § 18-15-4 specifically affords a trustee "a reasonabletime after accepting a trusteeship or receiving trust assets . . . to review trust assets and make and implement decisions concerning the retention and disposition of assets, in order to bring the trust portfolio into compliance with the purposes, terms, distribution requirements, and other circumstances of the trust, and with the requirements of this chapter." G.L. 1956 § 18-15-4 (emphasis added). In the instant case, Pamela became Trustee on November 26, 1999 and disposed of the concentrated proportion of Qualcomm Corporation stock within eight months, specifically on July 25, 2000. This Court declines to find that eight months was an unreasonable length of time, especially when Pamela spent the time period actively "receiving monthly statements and paying attention to them" and when at AGE, "the transition from one broker to another was causing delay and confusion." Sargent, No. PC08-1429, 2009 WL 3328560. Pamela saw "the need of putting into place a strategy to raise cash to pay estate taxes." Id. She wrote a "brief outline of her deliberative process" including "why she chose an alternative valuation date" and "directed her investment advisor at [AGE] to review the portfolio and recommend a strategy for raising cash."Id.
Though Plaintiffs argue that Pamela should have undertaken this liquidation of Qualcomm Corporation stock seven months earlier, this Court does not agree. A delay of eight months before disposing of a concentrated amount of stock is not per se imprudent. Nor do the circumstances in this case — a transition from one broker to another causing delay and confusion and the dot com bubble market trend — suggest that Pamela's diversification delay was wrongful, even though the stock did lose value. SeeScott Ascher, § 19.3.2 at 1443 ("A trustee who has a duty to dispose of a portion of an investment in order to dilute a concentrated position does not commit a breach of trust merely by delaying the sale for a reasonable period of time");id.§ 19.3.1, at 1439-40 *Page 16 
(suggesting that a term of one year to eighteen months is a reasonable time and stating that courts declined to surcharge a trustee for not disposing of an inappropriate trust asset forseveral years where the "trustee reasonably believed that an earlier sale would have resulted in an unnecessary sacrifice of value, although in fact the securities continued to decline invalue"). For example, In re Trust under Will of Comstock, the court held that "when there is a duty to convert trust property, . . . [o]rdinarily any time within a year is reasonable, but under some circumstances a year may be too long. . . . The question in each case is whether under all the circumstances the trustee acted with prudence in delaying the sale."17 N.W.2d 656, 662 (Minn. 1945) (emphasis added). InComstock, the court did not surcharge the trustee for holding onto a disproportionate amount of stock for almost two years, even though the "catastrophic stock market crash of 1929 and the prolonged depression" that occurred during the two year holding period caused the stock to lose almost all value.Id. at 663. In another case, the Matter of Wiese'sEstate, an executor was directed by a will provision to "convert securities into cash `within a reasonable time after [testator's] death, having regard to economic conditions at the time of my death so that said property will not be liquidated at a loss.'"257 N.W.2d 1, 6 (Iowa 1977). The executor did not liquidate the securities immediately because the executor determined that they had already lost value since testator's death, the portfolio was conservative, interest rates were declining, the market was starting to slightly recover, and because a market advisory service had suggested holding onto the securities. Id. The Weise
Court held that the executor had acted prudently, and thus he was not liable to reimburse the estate for loss sustained when he sold securities six months later even though the market had further declined. Id.
Like the executor in Weise and the trustee inComstock, Pamela was charged with bringing the Trust into compliance with the Prudent Investor rules and the Trust instrument itself *Page 17 
within a reasonable time. A reasonable time is dependent on the circumstances of the case, which as demonstrated by Weise andComstock is affected by the current trends in the market. During the first eight months that Pamela was the Trustee, she examined the Trust assets and began formulating a plan for administering the Trust. She knew that estate taxes were coming due and focused her attention on addressing that issue. Additionally, Pamela remained in close contact with AGE and consulted the brokerage company when making decisions. Clearly, Pamela did not fail to obtain professional advice. Restatement (Third) ofTrusts § 80 cmt. B. Ultimately, she made a proper decision to liquidate the disproportionate amount of Qualcomm Corporation stock to pay the estate taxes and other administrative costs. 4 Scott Ascher § 19.3.2 at 1444 ("[I]f it is necessary to raise funds, whether to pay distributions in cash or to pay administrative expenses, the trustee may prefer to liquidate a portion of the concentrated holding."). There was no way for Pamela to know that time was of the utmost essence and that she needed to dispose of the disproportionate Qualcomm Corporation stock within one month of becoming Trustee or else the holdings would lose substantial value. "[I]t has always been true that a trustee isnot liable for failing to dispose of inappropriate investmentsimmediately or even after a considerable interval, if, under the circumstances, the trustee has behaved prudently."Id. § 19.3.2 at 1436-37 (emphasis added); seealso Donato v. BankBoston, N.A.,110 F. Supp. 2d 42, 52 (D.R.I. 2000) ("[T]he unerring view of hindsight is not to be applied to determine the propriety of [a trustee's] administration of the Trust."); see also
Restatement (Third) of Trusts § 227 cmt. b (Prudent Investor Rule).
Accordingly, this Court finds that Pamela behaved prudently under the circumstances considering that "[a]s of April 2000, Standard Poor's continued to recommend accumulating Qualcomm shares." Sargent, No. PC08-1429, 2009 WL 3328560. The Court will not penalize *Page 18 
Pamela for not having the foresight to sell at the very top of a volatile market, especially when a reputable, worldwide leader of financial-market intelligence advises retention of Qualcomm Corporation shares. Eight months is well within a reasonable time period for bringing a trust into compliance with all Prudent Investor Act rules under these market circumstances. Prospectively from the vantage point where the Qualcomm Corporation stock had been appreciating value throughout 1999, waiting eight months until July 31, 2000 to dispose of the concentration of holdings was reasonable.
 iii Applicability of G.L. 1956 § 18-15-2(b) to Pamela's Failure To Diversify
Plaintiffs also argue that this Court inappropriately relied on § 18-15-2(b) to hold that Pamela did not breach her duty to diversify. Rhode Island codifies the Uniform Prudent Investor Act's standard of care for strategic portfolio investing at § 18-15-2(b). Upon reconsideration, this Court finds that Pamela's retention of a disproportionate amount of Qualcomm Corporation stock in the AGE brokerage account implicates § 18-15-3, not § 18-15-2(b).
Section 18-15-2(b) establishes that "a trustee's investment and management decisions respecting individual assets must be evaluated not in isolation but in the context of the trust portfolio as a whole and as part of an overall investment strategy having risk and return objectives reasonably suited to the trust."Id. (emphasis added). This statute minimizes liability on a trustee due to his or her decisions relative to singular
assets and the losses therefrom, but emphasizes that ideal investing requires proper investment of the whole portfolio. Proper investment of a portfolio necessarily relies on another Rhode Island statute — the requirement that a trustee must diversify the portfolio's holdings. See Section 18-15-3 ("A trustee shall diversify the investments of the trust unless the trustee reasonably determines that, because of special circumstances, the purposes of the trust are better served without diversifying."); seealso Kevin J. DiAdamo, *Page 19 In Re Estate Of Cooper: Washington's Revised Prudent InvestorRule, 12 Quinnipiac Prob. L.J. 197, 2006 (1997) ("Thus, the role of portfolio theory is to balance the risks and returns of a portfolio through diversification of the [singular] assets held. A key part of prudent investing now involves balancing the role of a single asset or group of assets against that of the overall portfolio, rather than viewing investments in isolation."). Diversification reduces non-market risk because "when some securities perform poorly, others may perform well, and the net effect is to insulate a portfolio from overall losses." Houman B. Shadab, The Law and Economics of Hedge Funds: FinancialInnovation and Investor Protection, 6 Berkeley Bus. L.J. 240, 265 (2009). At its most basic level, diversification works because it avoids putting all the "eggs in one basket" and instead "broaden[s] the different sources of investment risk to which an investor is exposed . . . [by] investing in a portfolio of numerous securities from a wide range of issuers and types of assets (e.g., stocks, bonds, commodities, real estate)." Id. As such, unlike § 18-15-2(b) which insulates a trustee from liability forsingle asset losses due to market risk, § 18-15-3 requires a trustee to diversify his or herwhole portfolio in order to reduce non-market risk completely.
Essentially, § 18-15-3's duty to diversify directs a trustee to address non-market risks by requiring that securities are spread out among different "baskets", while § 18-15-2(b) exonerates a trustee for market risk losses in a single "basket" as long as there is not a disproportionate or imprudent number of securities in that "basket". See Baker Boyer Nat. Bank v. Garver,719 P.2d 583, 673 (Wash. App. 1986) ("The trustee is under a duty to the beneficiary to exercise prudence in diversifying the investments so as to minimize the risk of large losses, and therefore he should not invest a disproportionately large part of the trust estate in a particular security or type of security. It is not enough that each of the investments is a proper investment . . ." (quoting *Page 20 
Restatement (Second) of Trusts § 228)). Accordingly, this Court acknowledges that § 18-15-2(b) does not particularly affect Pamela's alleged failure to diversify the Qualcomm stock. Section 18-15-2(b) only protects a trustee in his or her decision to retain an asset if that asset is properly diversified in accordance with § 18-15-3. These are two related, but notably different, requirements that a Trustee must accomplish.
That said, this Court emphasizes that all of Pamela's actions must be viewed against the backdrop Trust provision that Diane expressly included, stating that the Trustee has the power to retain property "which may be productive of little or no income or which may be speculative; to continue to hold any investments received from me [Diane] without regard to the proportion which such investments may bear to the total investment." (The Diane Sargent Revocable Trust-1998 at 12, pt. V, M). While this statement from the settlor does not absolve Pamela of the duty to observe the Prudent Investor Act rules, this Court finds that it does permit a relaxation in the duty to diversify. See Donato,110 F. Supp. 2d at 48 ("[T]he prudent man rule in Rhode Island . . . is a default rule that can be altered by the terms of the trust instrument."). Furthermore, this Court remains mindful that the trust instrument, in pertinent part in provision IV, section S, specifically provides:
 "In determining all matters involving discretion . . . and any other questions arising in the administration of the trust estate, the Trustee may rely upon such information as on reasonable inquiry may be deemed adequate, and having made a decision in good faith shall be free from any liability whatsoever in connection therewith."
Although § 18-15-3 states that "[a] trustee shall diversify the investments of the trust," this statutory provision nonetheless permits the "trustee [to] reasonably determine[] that, because of special circumstances, the purposes of the trust are better served without diversifying." Based on the relaxation of diversification provision provided in the Trust, Pamela's reliance on AGE's de *Page 21 
facto investment authority, and the fact that Pamela did properly diversify the concentration of Qualcomm stock holdings within a reasonable time of becoming a Trustee, this Court finds that Pamela did not breach her duty to diversify.
 2 The Sargent Brothers' Equitable Remedy i Balance Remaining in Trust
Plaintiffs next argue that in awarding the Sargent brothers the remainder of the Trust, this Court expressly intended that Jeffery and Kennett would split $141,191, which would provide each brother with the $64,040 balance on their original $400,000 corpus share plus $6550.50 of additional equitable relief. However, Plaintiffs assert that the Trust, which contained $141,191 after the 2008 Court-ordered distributions, [15] actually only contained $1429.01 at the time this Court issued its Decision on July 31, 2009. Although this Court did so intend this disposition, this Court in its Decision did recognize the possibility that the Trust no longer contained the full $141,191.See Sargent, No. PC08-1429, 2009 WL 3328560. In fact, this Court noted: "The record does not explain what, ifanything, happened to the balance of the Trust assets, equaling approximately $141,191." Id. (emphasis added). At the time of judgment, Jeffery and Kennett could not redeem the $64,040 balance of their $400,000 corpus share from the nearly depleted Trust.
At the same time, this Court also points out that the cause for depletion — a fact artfully omitted by Plaintiffs until pressed to explain during oral argument in the instant matter — was not *Page 22 
a direct result of any of Pamela's breaches of trust. During oral argument on October 5, 2009, Plaintiffs stated that "most of the $141,000 which was showed [sic] in the bills went to [Plaintiffs'] legal fees." (Recons. H'rg 23:12-14 Oct. 5, 2009.) Despite this acknowledgement, Plaintiffs still urge this Court that Pamela should be responsible for reimbursing the Trust for the funds spent by Plaintiffs' themselves. Arguably, according to Plaintiffs, if the Trust were replenished by Pamela, the Sargent brothers would be able to enjoy the equitable remedy as initially intended by this Court. Plaintiffs argue on policy grounds that beneficiaries and trustees who incur legal fees when acting to vindicate a trust from a predecessor trustee's breach should receive reimbursement for those expenses from the personal coffers of the breaching trustee. Though their contention resonates in fairness, it lacks significant support in trust law and violates the American Rule: the general requirement that each litigant pays his or her own attorneys' fees in the absence of statutory authority or contractual liability.See Moore v. Ballard, 914 A.2d 487, 489 (R.I. 2007) (citing Eleazer v. Ted Reed Thermal Inc.,576 A.2d 1217, 1221 (R.I. 1990)).
At the outset, this Court notes that neither the Co-Trustees nor the Sargent brothers personally incurred any expenses in this action. Instead, the Trust rightfully bore all costs of the protracted legal matter. It is well-established that a party who successfully brings an action to remedy a breach of trust may have its attorneys' fees paid by the trust itself.[16] See,e.g., Internal Imp. Fund Trustees v. Greenough,105 U.S. 527, 532-33 (1881) *Page 23 
(holding "that where one of many parties having a common interest in a trust fund, at his own expense takes proper proceedings to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement, either out of the fund itself, or by proportional contribution from those who accept the benefit of his efforts"); Shriner v. Dyer,462 So.2d 1122, 1124 (Fla. App. 1984) (holding that the beneficiaries who brought the breach of trust suit were entitled to have their attorneys' fees paid out of the trust after the co-trustees returned funds they used to pay their own attorneys' fees). In their discretion to administer the Trust, the Co-Trustee Plaintiffs brought the instant action on behalf of the estate and its beneficiaries using the Trust's own proceeds. In doing so, the Co-Trustees availed themselves of the "common fund" exception of the American Rule. See, e.g., Chambers v. NASCO,Inc., 501 U.S. 32, 45 (1991) (stating that a court may abridge the American Rule pursuant to its inherent powers if a party's "litigation efforts directly benefit others"); Gavin v.Miller, 54 N.E.2d 277 (Ind. 1944) ("The right to recover attorneys' fees from one's opponent does not exist in the absence of a statute or some agreement, though a court of equity may, under some circumstances, allow attorneys' fees to be paid out of a fund brought under its control."). Essentially, if the litigation "was for the benefit of the estate as a whole, costs and fees will be allowed out of the trust funds; if it was not, no allowance out of the *Page 24 
estate will be made." A. M. Swarthout, Annotation, Allowanceof attorneys' fees in, or other costs of, litigation by beneficiaryrespecting trust, 9 A.L.R.2d 1132, § 36.
In addition, the Trust in the instant case expressly states that the Powers of the Trustee include the right to "[t]o employ . . . attorneys . . . and to pay the expenses of the foregoing as additional costs of administration." (The Diane Sargent Revocable Trust-1998 at 12, pt. V, M); see Restatement (Second)Trusts § 188, cmt. f ("A trustee's power to incur expenses is limited to those expenses which are reasonably necessary or appropriate to carry out the purposes of the trust."); seealso Williams v. Smith, 10 R.I. 280 (R.I. 1910) ("A trustee will be allowed the benefit of a charge upon the estate for advances made at his own risk in doing what the court would have authorized him to do had its instruction been asked beforehand."). As such, because the Co-Trustee Plaintiffs were attempting to prove that the predecessor Trustee, Pamela, had committed various breaches of trust, spending the Trust assets on litigation intended to vindicate the Trust was a reasonable endeavor aimed at benefiting the Trust as a whole and its beneficiaries. However, the request that the Co-Trustees make to this Court is not for Trustassets to fund their litigation; rather it is to havePamela, as the breaching Trustee, reimburse the Trust for Plaintiffs' legal expenses.
Though no authorities were cited by Plaintiffs, this Court recognizes that some jurisdictions, in rare circumstances, have held a breaching trustee personally responsible for the attorneys' fees of the beneficiaries or successor trustees who brought the action. See Feinberg v. Adolph K. Feinberg HotelTrust, 922 S.W.2d 21, 27 (Mo. App. 1996) (assessing [attorneys'] fees, not against the trust, but against the trustee personally because that trustee has engaged in self-dealing"); Matter ofEstate of Cooper, 913 P.2d 393, 400 (Wash. App. 1996) (stating "[i]f there is a breach of fiduciary duties [in Cooper, the duty of prudent investing] the plaintiff has a *Page 25 
right to recover fees against the trustee personally");Allard v. Pacific Nat. Bank, 663 P.2d 104, 112 (Wash. 1983) (holding that "where litigation is necessitated by the inexcusable conduct of the trustee, . . . the trustee individually must pay those expenses"); Wilmington Trust Co. v. Coulter,208 A.2d 677, 682 (Del. Ch. 1965) (holding that "courts assess counsel fees against a trustee individually, only when his conduct has been of a gross or inexcusable nature" and holding that the Trust Company had not committed inexcusable conduct where it was "not guilty of fraud, bad faith or the like," nor were its acts "the result of intentional wrongdoing or its equivalent").
However, such case law reveals that in general, trust actions do not automatically create an exception to the American Rule. Rather it is not generally accepted that the losing party must reimburse the prevailing party for its legal fees. See McNeely v.Hiatt, 909 P.2d 191, 197 (Or. App. 1996) (recounting the rejection of a request for "attorney's fees to be paid by the trustee personally" and commenting, `"That may be an equitable result, but we know no authority for that kind of award.'" (quotingHatcher v. U.S. Nat'l Bank,643 P.2d 359, 372 (Or. App. 1982))); Webbe v. First Nat. Bank andTrust Co. of Barrington, 487 N.E.2d 711, 715 (Ill. App. 1985) (holding that "an attorney's fee cannot be charged personally against a defeated plaintiff suing a trustee as beneficiary, absent statutory authority"); Hardy v. Hardy,230 S.W.2d 11, 16 (Ark. 1950) (finding that "a trustee is responsible to beneficiary for any damages sustained by reason of trustee's misconduct or neglect, [but that] the record justified trial court in refusing to assess attorney's fees against trustees individually" where the beneficiary's only rationale for the fees was because "trustee denied beneficiary rights and privileges due to him from the trust"). Essentially, as our Supreme Court found inBlue Cross Blue Shield of R.I. v. Najarian,911 A.2d 706, 711 n. 5 (R.I. 2006), attorneys' fees may only be awarded pursuant to a court's inherent *Page 26 
powers in three narrow circumstances: "common fund exception," "as a sanction for the willful disobedience of a court order," or "if a party acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Id.
(quoting Chambers, 501 U.S. at 45-46)).
Though sensitive to the plight of Plaintiffs and the Sargent brothers, whose victory was rendered pyrrhic by their expenses, this Court declines to charge Pamela with Plaintiffs' attorneys' fees.See Wilmington Trust Co., 208 A.2d at 682 (concluding "even though, as these petitioners state, the ultimate result is to deplete the trust estate, since their [petitioners'] fees are concededly allowable from the trust estate[, t]his is a `burden' which most successful litigants must bear under the applicable general rule in this country"). The instant facts before this Court do not warrant such an award.
As this Court found in its July 31, 2009 Decision, Pamela was not liable for all the breaches of which she was accused. In this Court's judgment, Pamela neither acted with malice, nor breached her duties to prudently invest or act impartially. Pamela's conduct did not warrant punitive damages. Furthermore, Pamela was not a nefarious self-dealer, fund commingler, or thief. Without a doubt, Pamela was not a portrait of an efficient, conscientious Trustee, and her treatment of Kennett arbitrarily did not employ her "best judgment," which "caused him unnecessary suffering."Sargent, 2009 WL 3328560. Nonetheless, this Court is not persuaded that Pamela's actions rise to the level of fraud, bad faith, vexatiousness, or intentional wrongdoing to support such an award of attorneys' fees. See Najarian,911 A.2d at 711 n. 5. Once Pamela became the Trustee in November 1999, she made a concerted effort to stay in contact with the legal and investment advisors her mother, Diane, had relied upon to create the Trust. Even though Pamela's actions and inactions are hers alone, this Court notes that Pamela's advisors — justifiably selected by Pamela because they were Diane's confidantes — did not *Page 27 
provide the most lucid and succinct guidance to a new Trustee. Accordingly, in the absence of bad faith and vexatiousness, this Court is unwilling to grant Plaintiffs' request to require Pamela to personally reimburse the Trust $141,191 and effectively bear the burden of Plaintiffs' attorneys' fees.
 ii Time Value of Money
Although expounding upon why this Court's equitable remedy for Jeffery and Kennett was improper given the near depletion of the Trust fund, Plaintiffs merely raise, but do not adequately support, their argument that this Court should have calculated the Sargent brothers' lost time value of money and added it to their award.See Catucci v. Pacheco, 866 A.2d at 516 ("Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue."). This Court's equitable awards are discretionary. See Ruggieri v. Cityof East Providence, 593 A.2d 55, 57 (R.I. 1991) (reiterating that that "it is within the trial justice's discretion to determine the appropriateness of, and to formulate, equitable relief");R.I. Turnpike Bridge Auth. v. Cohen,433 A.2d 179, 192 (R.I. 1981) (stating that a court must "survey the facts and apply the traditional tests for equitable relief. This involves balancing the equities, weighing the hardships to either side, and examining the practicality of imposing the desired relief"). Accordingly, as this Court did not originally find that awarding time value of money damages was equitable, and Plaintiffs have not directed this Court to any new argument or persuasive justification for why such damages are warranted, this Court will not adjust the award to account for this value. *Page 28 
 3 Attorneys' Fees Sanction for the Belated 1999-2004 Trust Accounting
Plaintiffs argue that the September 1, 2009 Order fails to adequately account for Pamela's willful disobedience of this Court's September 28, 2004 Order. This Court upon reconsideration will amend its decision accordingly.
On September 28, 2004, this Court afforded Pamela thirty (30) days to produce an accounting of all the Trust transactions that occurred from the time Pamela assumed the trustee role in November 1999 until September 28, 2004 when the 2004 Order was issued. It took Pamela multiple attempts and far longer than thirty days to amass a document that satisfied this 2004 Order. Pamela first supplied a one-page summary on September 28, 2004, then a "draft accounting" on October 14, 2005, and finally a "preliminary accounting" on August 3, 2006. This Court found Pamela's lack of diligence or sense of urgency regarding the September 28, 2004 Consent Order was "contumacious" and warranted a sanction. As referenced in its July 31, 2009 Decision and then demanded in the September 1, 2009 Order, this Court attempted to tailor its sanction to fit Pamela's contempt by requiring her to pay Plaintiffs' attorneys' fees from September 28, 2004, the date the Consent Order was issued, through October 14, 2005, the date Pamela provided the draft accounting. This Court's stated intention was to sanction for those "fees directly related to compelling Pamela to produce the accounting after September 28, 2004." Sargent, No. PC08-1429, 2009 WL 3328560. However, upon reconsideration, this Court finds the "draft accounting" was an unsatisfactory account of the 1999-2004 Trust transactions and was insufficient to comply with the 2004 Order. The record shows that Pamela did not comply with the 2004 Order until August 3, 2006 when she provided the "preliminary accounting." As such, this Court amends the end date for attorneys' fees from October 14, 2005 to August 3, 2006, *Page 29 
which now makes Pamela responsible for Plaintiffs' attorneys' fees incurred from September 28, 2004 through August 3, 2006 when the "preliminary accounting" was completed.
In their Motion, Plaintiffs also argue that this Court should require Pamela to reimburse Plaintiffs for the attorneys' fees they incurred up until Pamela provided the "full and final accounting" of the Trust on June 13, 2008. However, the full and final accounting was provided by Pamela to oblige this Court's second Consent Order (2008 Order) issued on or about January 31, 2008, and which required a full report of the Trust transactions for the entire time Pamela was the Trustee — November 1999 through September 14, 2007. Thefirst Consent Order (2004 Order) that was issued on September 28, 2004 and had the thirty-day deadline only required Pamela to report Trust transactions from November 1999 through September 28, 2004. Accordingly, it was this first Consent Order (2004 Order), not the second Order (2008 Order), and the 2004 Order's thirty-day requirement that Pamela violated contumaciously. As such, this Court shall sanction Pamela only for the time period she was in violation of the first Order — September 28, 2004 through August 3, 2006.
Plaintiffs have submitted Joyce Chatard v. Greg Oveross, 179 Cal. App. 4th 1098 (Cal. Ct. App. 2009), a case decided subsequent to the original Decision in this case. The Plaintiffs claim that Chatard — a case in which a California trial court surcharged a trustee-beneficiary's share of a family trust as compensation for several violations of her fiduciary duties — provides precedent for this Court to award the Plaintiffs additional money. Chatard held that a trust's spendthrift clause does not prevent a court from surcharging a beneficiary's share of a trust to satisfy compensatory damages.Id. at 1108.
The Chatard case is distinguishable from the instant case for two reasons. First, there is no claim in this case that a spendthrift clause is preventing the Plaintiffs from receiving a part of *Page 30 
the Defendant's share of the Trust. In fact, the Defendant's share of the Trust has already been distributed. Second, whereas the amount at issue in the Chatard case representedcompensatory damages, the Plaintiffs are effectively asking that their attorneys' fees be paid by the Defendant. As statedsupra, absent a finding of bad faith, the Court is bound by the American Rule and Plaintiffs must pay their own way in their litigation. Though the attorneys' fees consumed much of the $141,191 awarded to Plaintiffs, the Plaintiffs are in the same position in which they would have been had they received the full $141,191 and then paid attorneys' fees out of pocket. Ordering the Defendant to give additional compensation to the Plaintiffs would have net effect of the Defendant paying for the Plaintiffs' attorneys' fees. In the Chatard case, the trial court found bad faith and awarded attorneys' fees.Id. at 1104. The award of attorneys' fees was not appealed by the trustee-beneficiary, and the Chatard decision did not address attorneys' fees. Id. Thus, the Chatard case is distinguishable from the instant case and does not alter this Court's application of the American Rule.
 B Prejudgment Interest
Separate from Plaintiffs' reconsideration requests, Defendant also argued at the October 5, 2009 hearing that this Court should refrain from applying prejudgment interest to the $43,628 disgorgement of Pamela's Trustee fees. Defendant cited Rhode Island Supreme Court precedent — In re Cantore and Rhode Island Insurers'Insolvency Fund v. Leviton Mfg. Co., Inc. — to assert that Plaintiffs' award is a reimbursement, not pecuniary damages, and therefore is not interest eligible per G.L. 1956 § 9-21-10. In its written memorandum submitted to this Court on October 26, 2009, Plaintiffs conversely argued that prejudgment interest was justified. Plaintiffs attempted to distinguish the two Rhode Island authorities cited by Defendant to show that this Court's award actually was for pecuniary damages because Pamela was found *Page 31 
malfeasant, whereas the Rhode Island cases cited by Defendant lacked malfeasance and therefore constituted non-pecuniary, interest-ineligible reimbursements.
This Court agrees with Plaintiffs. Prejudgment interest is applicable to the $43,628 award because this Court specifically intended the disgorgement to compensate the Trust for Pamela's negligent actions and inactions.
Section 9-21-10(a) states in pertinent part:
 "In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein. . . . This section shall not apply until entry of judgment or to any contractual obligation where interest is already provided." (Emphasis added.)
Considering there are only "three recognized categories of damages[ — ]compensatory, punitive, or nominal[ — ]"our Rhode Island Supreme Court has explained that there is "no doubt that the Legislature, in employing the term `pecuniary,' was using it as a synonym for `compensatory.'" Murphy v. United Steelworkers of Amer. LocalNo. 5705, AFL-CIO, 507 A.2d 1342, 1346 (R.I. 1986). "Compensatory damages are awarded to a person in satisfaction of or in responseto a loss or injury sustained." Id. (emphasis added).Cf. La Plante v. American Honda Motor Co.,Inc., 27 F.3d 731, 745 (1st Cir. 1994) (citingMurphy and finding that pain and suffering damages are also compensatory — not punitive or nominal — and therefore warrant the application of prejudgment interest to such awards). TheMurphy Court went on to explain that "§ 9-21-10 was never intended to encompass an award of either punitive or nominal damages." Id. Without question, this Court intended the disgorgement to compensate the Trust for Pamela's "negligence," which "caused some loss." Sargent, No. PC08-1429, 2009 WL 3328560 *Page 32 
(emphasis added). As such, this Court is satisfied that the disgorgement award was compensatory and pecuniary and therefore, interest-eligible per § 9-21-10(a).
Though the issue of prejudgment interest in the instant case is seemingly resolved by Murphy, this Court for purposes of discussion will note the authorities relied upon by Defendant. InCantore, the plaintiff brought an action in the Rhode Island Probate Court for an accounting of her mother's estate, which the defendant was later required to reimburse. In re Estate ofCantore, 814 A.2d 331, 335 (R.I. 2003). The Probate Court did not make an explicit factual finding that the defendant had misappropriated any funds, just that the funds went unaccounted for and it was equitable for the defendant to reimburse them without prejudgment interest. Id. at 333. Subsequently, the plaintiff appealed the Probate Court's decision to refrain from applying prejudgment interest to the defendant's reimbursement.Id. at 335. Finding that the award "was neither a contract claim nor a tort claim[] [but] rather . . . an action for reimbursement, which is not the equivalent of a civil action for pecuniary damages[,]" id., our Supreme Court denied the plaintiff's request for prejudgment interest. Conversely, here, Pamela rightfully paid herself Trustee fees in the amount of $43,628, so these funds were never unaccounted for by the Trust. It was not until this Court made a finding that Pamela's actions "caused some loss to the trust" and that Pamela "consistent[ly] fail[ed] to act in her brothers' best interests" that this Court made the discretionary decision to disgorge Pamela of her earnings as "an appropriate remedy." Sargent, No. PC08-1429, 2009 WL 3328560. Because the disgorgement of Pamela's Trustee fees was intended to be compensatory, it follows that this damage award is pecuniary and therefore interest eligible.See generally Fravala v. City of Cranston,996 A.2d 696, 707 (R.I. 2010) (holding that "determination of benefits, by way of a declaratory judgment, was not an award of damages"). *Page 33 
Defendant also relies on Rhode Island Insurers' InsolvencyFund v. Leviton Mfg. Co., Inc., which is similarly inapposite. 813 A.2d 47 (R.I. 2003). This case involves reimbursement from the Rhode Island Insurers' Insolvency Fund ("Fund"), a Legislature-created, non-profit entity that "guarantee[d] payments to an insured if the insurer becomes insolvent." Id. at 48. Per a subsequent statue, the Fund was specifically allowed to recoup past payments to an insured if the insured's net worth was greater than $50 million. Leviton fell into this net worth category, and the Fund sought court-ordered reimbursement for the payments it had already made to Leviton. The Court agreed that Leviton should reimburse the Fund pursuant to the statute, but declined to apply prejudgment interest to the repayment. The Court reasoned: because "the Fund is not seeking damages, but merely reimbursement for payments it was statutorily required to make on Leviton's behalf. . . . The Fund has suffered no additional loss, deprivation, or injury, save for the statutorily required expenditures made . . . pursuant to the Insolvency Fund Act." Id. at 49 (quoting R.I. Insurers'Insolvency Fund v. Leviton Mfg. Co.,763 A.2d 590, 597-98 (R.I. 2000) (Fund II))). In addition, the "act made clear that the Legislature intended that no prejudgment interest, statutory or otherwise, be accrued on Insolvency Fund Act reimbursements." Id. at 50. Unlike Leviton, where a statutory amendment spawned the Fund's cause of action and the statute explicitly prohibited prejudgment interest, here, Pamela's negligence caused loss and injury to the Trust. This Court specifically assessed compensatory damages in the form of disgorgement for Pamela's negligent and improper actions. As such, § 9-21-10 and its 12% prejudgment interest rate apply to the disgorgement.
 C Temporary Restraining Order
In a memorandum submitted on September 25, 2009 and during the October 5, 2009 oral arguments, Defendant prayed that this Court lift the TRO applied to Pamela's assets. Plaintiffs *Page 34 
opposed such action in their memorandum on October 1, 2009 and during oral arguments on October 5, 2009. This Court declines to lift the TRO.
Given that this Court now has increased the amount that Pamela is required to reimburse the Trust and that Pamela has not provided any assurance that she will continue to have the ability to pay the judgment after the TRO is lifted, this Court will not remove the current restraints on Pamela's assets. SeeSch. Comm. of N. Kingstown v. Crouch,808 A.2d 1074, 1077 (R.I. 2002) (stating the requirements to issue an order as "(1) [w]hether the moving party established a reasonable likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm without the requested injunctive relief; (3) whether the balancing of the equities, including the public interest, weigh in favor of the moving party; and (4) whether the issuance of [the temporary retraining order] serve[s] to protect the status quo ante."). It is within the sound discretion of this Court to grant or maintain the injunction. See Brown v.Amaral, 460 A.2d 7, 10 (R.I. 1983). This Court finds that maintaining the TRO on Pamela's assets serves to protect the status quo ante and prevent depletion of any assets rightfully owed to Plaintiffs.
 III Conclusion
This Court has reconsidered its July 2009 Decision. This Court finds that Pamela did not breach her duties to prudently invest or diversify assets. The Sargent brothers' equitable remedy, is the remainder of the Trust, which has been depleted by the Co-trustees' legal fees. Though sensitive to Plaintiffs' pyrrhic victory, this Court is bound by trust law and the American Rule, which do not, on the facts before this Court, justify charging Pamela personally with the further expense of opposing counsel. This Court also declines to adjust the award for the time value of money. This Court does, however, amend the time frame for attorneys' fees incurred relative to compelling Pamela to abide by this Court's 2004 Order. As such, Plaintiffs shall submit invoices *Page 35 
reflecting all attorneys' fees generated from September 28, 2004 through August 3, 2006, rather than through October 14, 2005. This Court directs the application of prejudgment interest to Pamela's $43,628 disgorgement. Finally, this Court declines to lift the TRO on Pamela's assets until this judgment is paid. The parties shall prepare the appropriate judgment consistent with this decision for final entry.
[1] This section merely is a brief recitation of the Sargent family's multi-year legal battle and states only those facts necessary to resolve the questions presented by Plaintiffs' Motion. A more comprehensive history of this case is available at Sargent v. Sargent, No. PC08-1429, 2009 WL 3328560 (R.I. Super. Ct. July 31, 2009).
[2] Although Pamela was entitled to receive her entire $400,000 share outright, she opted to disburse an initial inheritance of $335,960 to herself. In addition, Pamela also paid herself $43,628 in trustee fees.
[3] The Trust's instructions charged Pamela with providing Trust income or principal for the "care, maintenance, support, education or welfare" of Lisa, Jeffrey, and their children, if any. These directions appear to grant a "support trust" in favor of the beneficiaries. However, the Trust also gave Pamela the discretion to determine whether a payment request from Lisa or Jeffrey was "deem[ed] advisable" and Pamela could withhold distributions accordingly. These additional terms indicate the character of a discretionary trust, which would require closer scrutiny of Pamela's Trustee actions and inactions at the heightened abuse of discretion standard. Nonetheless, it was not necessary for this Court to determine which type of trust Diane actually intended to create because even under the most lenient of standards, Pamela's actions regarding Jeffrey's Trust benefits were a breach.
[4] To administer the "special needs trust," Pamela was directed to use her discretion to maintain Kennett's good health, safety, and welfare at a level of "human dignity" and provide for any necessaries that government public resources did not offer.
[5] Prior to the "preliminary accounting," Pamela had submitted an insufficient "summary accounting" to her attorney on September 28, 2004 and then an equally insufficient "draft accounting" of the Trust transactions to the Court on October 14, 2005.
[6] The fourth sibling, Lisa, had received $402,500 (in the form of Diane's house at 11 Barnes St. Providence, Rhode Island) in the fall of 2000, which accounted for her total distributive share plus compensation for taking care of Diane in her final days. Lisa is not a party to the instant suit initiated by the Co-Trustees or the previous suit initiated by Jeffrey and Kennett.
[7] In response to this 2008 Order, Pamela submitted the "full and final accounting" for her entire 1999-2007 tenure as trustee on June 13, 2008. The 2004 Order only required Pamela to provide an accounting of the Trust for 1999-2004. Pamela completed a sufficient "preliminary accounting" per the 2004 Order on August 3, 2006.
[8] For example, sister Lisa Sargent received $402,500 in the fall of 2000 to account for her total distributive share plus compensation for taking care of Diane in her final days.
[9] The brokerage account was one of three major assets included as the Trust corpus. Besides the A.G. Edward's account, which was worth approximately $2 million at the time of Diane's death, the Trust also contained a mutual fund account held by Commonwealth Financial Network worth $23,486, and real estate located at 11 Barnes St. in Providence, Rhode Island worth $420,000. Lisa ultimately acquired the 11 Barnes Street property in the Fall of 2000 after paying the difference between the purchase price of the property and the amount she should have received as her distributive share from the Trust. Lisa's distributive share plus compensation for providing care to Diane in her final days was $402,500.
[10] As such, this Court focuses its reconsideration therein.Cf. Catucci v. Pacheco, 866 A.2d 509, 516 (R.I. 2005) ("Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." (quoting Wilkinson v. StateCrime Laboratory Comm'n, 788 A.2d 1129, 1132 n. 1 (R.I. 2002) (holding that where Plaintiff "lists twelve different specifications of error on appeal, the majority of them [that] are not discussed in the body of his brief' are deemed waived))).
[11] Property included in decedent's gross estate is generally valued as of the date of the decedent's death; however, the Internal Revenue Code authorizes the executor to employ an alternative valuation method whereby the property is valued as of the date six months after the date of the decedent's death. 26 U.S.C. § 2032; 47B CJS Internal Revenue § 525 (adding that "[t]he purpose of the alternate valuation method is to permit a reduction in the amount of tax that would otherwise be payable where the gross estate has suffered a shrinkage of its aggregate value in the six months after the decedent's death").
[12] Plaintiffs' expert testified that reduction to 5% of any holdings was the industry standard.
[13] Plaintiffs' expert testified that reduction to 5% of any holdings was the industry standard.
[14] "According to Standard Poor's Stock Reports, Qualcomm stock increased in value over 2000% in 1999 alone. . . . [A]s of April 2000, Standard Poor's continued to recommend accumulating Qualcomm shares." Sargent, No. PC08-1429, 2009 WL 3328560.
[15] Upon a request for guidance from the Co-Trustees on January 31, 2008, this Court directed Coastline and Francis to distribute the requisite funds to Jeffrey and Kennett in order to make their shares equivalent Pamela's outright distributed share. As such, soon after January 2008, Pamela, Jeffery and Kennett's receipts from the Trust were $335,960 each, while the fourth sibling, Lisa, received a net of $402,500 in the form of the 11 Barnes Street Property and as compensation for caring for their mother in her final days.
[16] A variation of this postulate, though not implicated in the instant case, is also justified. If a current trustee is charged with a breach of trust, he or she also may redeem attorneys' fees from the trust provided that he or she is exonerated for the breach.See, e.g., Shear v. Gabovitch,685 N.E.2d 1168, 1194 (Mass. App. 1997) ("In general, a trustee is entitled to look to the trust for reimbursement of funds he reasonably expends in defending against charges of maladministration brought against him without fault on his part, and `complete success on the merits is not a prerequisite to the recovery of fees and expenses.'" (quoting Gordon v. Guernsey, 55 N.E.2d 27 (1944)). Conversely, a current trustee is not allowed to redeem his or her attorneys' fees from the trust if he or she is found liable for breach. See, e.g., Allard v. Pacific Nat. Bank,663 P.2d 104, 112 (Wash. 1983) ("A trustee whounsuccessfully defends against charges of breach of fiduciary duties obviously has not caused a benefit to the trust. Therefore, a trial court abuses its discretion when it awards attorney fees [from the trust] to a trustee for litigation caused by the trustee's misconduct.") (emphasis added); Nat'l Acad. of Sciences v.Cambridge Trust Co., 346 N.E.2d 879, 885 (Mass. 1976) (stating that a "trustee is not entitled to indemnity if the incurring of the expense became necessary because of his own fault"); In reBaird's Estate, 287 P.2d 372, 376 (Cal. App. 1955) ("Where a trustee by reason of his own greed or indifference has breached his duty to the trust and has thereby brought on litigation against it his expense must be borne out of his own property." (quoting Inre Estate of Vokal, 263 P.2d 64, 69 (Cal. App. 1953))).